[No. 15556-3-I.   Division One.   September 22, 1986.]

BERTRAM J. DU PONT, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Defendant*, THE MUNICIPALITY OF METROPOLITAN SEATTLE, *Appellant*.

*Scott A. Smith* and *Preston, Thorgrimson, Ellis & Holman*, for appellant.

*Graham Fitch* and *Fitch & Ludwick*, for respondent.

PEKELIS, J.—The Municipality of Metropolitan Seattle (Metro) appeals the finding entered by the trial court that the Board of Industrial Insurance Appeals erred in deciding that as of April 19, 1983, claimant Metro bus driver Ber-

tram J. Du Pont's condition related to his industrial injury was fixed and further treatment was not indicated. Metro also appeals the court's denial of its motion to prevent Du Pont from submitting proof on the issue of whether his claim should have been closed. We affirm the trial court.

On March 1, 1982, Du Pont twisted his right knee when he slipped and fell while walking down some stairs at the Metro transit base. On April 22, 1982, the Department of Labor and Industries issued an order allowing the claim.

In May 1982, Du Pont was referred to Dr. Charles Peterson, an orthopedic specialist, who performed arthroscopic surgery on the knee. Following a program of physical therapy, Du Pont returned to work in July 1982. On September 4, 1982, Du Pont reinjured his knee at work, and on October 8, 1982, Dr. Peterson once again performed arthroscopic surgery, removing a large portion of torn cartilage. On January 28, 1983, Dr. Peterson released Du Pont to return to work as of February 4, 1983.

On February 3, 1983, Dr. Irving Tobin, an orthopedic specialist, examined Du Pont at the request of Metro and concluded that Du Pont's injury had reached a fixed state. He further recommended that Du Pont's claim be closed. In a letter dated February 15, 1983, Dr. Peterson agreed with Dr. Tobin's conclusions regarding Du Pont's knee. Du Pont returned to see Dr. Peterson on February 25, 1983, after he had returned to work, because his knee was bothering him.[1] On March 7, 1983, the Department issued an order closing Du Pont's claim, concluding that Du Pont had "sustained a permanent partial disability of 25% amputation value of the right leg". On April 19, 1983, the Department denied Du Pont's request for reconsideration and adhered to its March 7 order. On May 13, 1983, Du Pont filed a notice of appeal to the Board from the April 19 order, alleging that the Department closed his claim with

---

[1]Du Pont next saw Dr. Peterson on May 20, 1983, because of "a pop in knee" as well as swelling and pain. On October 4, 1983, Dr. Peterson also treated him for tendonitis in the knee.

an inadequate disability award. At the August 23, 1983 prehearing conference, Du Pont maintained that the notice correctly stated the issue before the Board.

On August 31, 1983, after receiving a letter from Dr. Peterson,[2] Du Pont's attorney advised Metro that he took issue with the initial closure decision. On November 14, 1983, Du Pont filed an amended notice of appeal which advised the Board, the industrial appeals judge, and Metro that

> the relief sought . . . is the additional treatment and the ability to have his claim remain open until such time as his attending physician feels it is ready to be closed. We will not be presenting any evidence as to additional permanent partial disability as it is the workman's position that rating of disability is premature until his case is ready for closure.

The hearing before the industrial appeals judge was held on December 1, 1983. Dr. Peterson testified on cross examination regarding the office visits of February 25, May 20, and October 4:

Q. And the treatment was nothing that would make his knee medically better?

A. That's probably true. It's not going to be medically better, but, on the other hand, we can alleviate the pain and can keep the patient working, although it doesn't change the underlying quality of the impairment.

Q. The impairment is, then, fixed?

A. That's up to you, right.

. . .

Q. . . . So the times you saw him were to treat his pain and symptoms, but, as you said, he had the underlying medical condition remaining the same?

A. That's true.

---

[2] The body of the letter stated in full:

"He has had trouble with his knee twice since his surgery. The most recent episode being around May 20.

"I think that this man continues to have problems with his knees. I think that he probably should keep his claim open for another six months or so and at that time a closing examination could be performed."

Q. And it was therefore—would you term that medically fixed?

. . .

    Whether, from your legal point of view, it is fixed or not, I do not know. From a medical point of view, I think I make the knee better. He feels better, and that is all that I can really say. I am probably not going to change the cruciate laxity and probably not going to change the degeneration of the medial compartment.

Dr. Peterson also testified that he could improve the knee with surgical treatment, but he did not feel that Du Pont's condition was serious enough to require that.

In Dr. Tobin's deposition, which was admitted into evidence, he testified:

A. My opinion [about Du Pont's medical condition] was one, that he had been injured on the job, that he had adequate treatment, that his condition was fixed, that further definitive treatment was not indicated, that he did have a residual permanent impairment of function as a result of that injury.

. . .

Q. Do you have further opinions?

. . .

A. In view of his complaints and the findings at the time of my examination, treatment at that point would have been palliative in nature only. Further treatment would be palliative in nature.

On March 5, 1984, the industrial appeals judge entered a proposed decision and order reversing the Department's closing of Du Pont's claim, finding, in part:

As of April 19, 1983, the claimant's condition causally related to his industrial injury of March 1, 1982, was *not fixed and further curative treatment was indicated.*

(Italics ours.) Upon review of the proposed decision, the Board first determined that it had jurisdiction to hear the issue of whether further treatment was indicated. However, it declined to adopt the proposed decision and instead affirmed the Department's April 19 order that Du Pont's condition was fixed.

Du Pont appealed the Board's decision to superior court, which in a judgment entered October 8, 1984, reversed the Board, concluding:

The Board of Industrial Insurance Appeals in rendering its decision on the 31st day of May, 1984, was *incorrect* when they determined that as of April 19, 1983, the Claimant's condition causally related to his industrial injury of March 1, 1982 was fixed and further treatment designed to lessen his permanent impairment was not indicated.

Metro appeals and assigns error to the trial court's denial of its motion to prevent Du Pont from submitting proof on the issue of whether his claim should have been closed. Metro alleges that under RCW 51.52.070 Du Pont waived his right to appeal his disability status when he did not include the issue in his initial notice of appeal to the Board or raise it during the August 23 prehearing conference.

The provisions of the Industrial Insurance Act, RCW Title 51, should be liberally applied to achieve its purpose which is to provide expedient relief to those coming within its provisions. *Sacred Heart Med. Ctr. v. Carrado,* 92 Wn.2d 631, 635, 600 P.2d 1015 (1979); *Lloyd's of Yakima Floor Ctr. v. Department of Labor & Indus.,* 33 Wn. App. 745, 748, 662 P.2d 391 (1982). RCW 51.52.070 provides in relevant part:

The notice of appeal to the board shall set forth in full detail the grounds upon which the person appealing considers such order, decision, or award is unjust or unlawful, and shall include every issue to be considered by the board . . . The worker . . . shall be deemed to have waived all objections or irregularities concerning the matter on which such appeal is taken other than those specifically set forth in such notice of appeal *or appearing in the records of the department. . . .*

(Italics ours.)

In *Brakus v. Department of Labor & Indus.,* 48 Wn.2d 218, 220, 292 P.2d 865 (1956), the court interpreted RCW 51.52.070 to mean that the notice of appeal must include every issue the appealing party wishes the Board to con-

sider, but in dictum recognized that the notice of appeal may be amended with the permission or suggestion of the Board. *Brakus,* at 223 (citing RCW 51.52.095). In *Lenk v. Department of Labor & Indus.,* 3 Wn. App. 977, 478 P.2d 761 (1970), the court gave the Board's scope of review under RCW 51.52.070 a more liberal interpretation, stating that both the scope of the Department's order, as well as the content of the notice of appeal, determines the Board's scope of review. *Lenk,* at 982 n.9.

Taken as a whole, the clear implication of these authorities supports the Board's decision to allow the amendment and admit evidence regarding the closure of his claim. The trial court did not err in allowing Du Pont to submit proof on this issue.

Metro next assigns error to the trial court's substantive finding that the condition of Du Pont's knee was not fixed. Metro argues that there was not substantial evidence to support the trial court's finding because (1) the testimony of both doctors who examined Du Pont can only support the conclusion that the condition was fixed, (2) to the extent Dr. Peterson's testimony supports Du Pont's position, it is based on inadmissible hearsay and is unsubstantiated by objective medical evidence, and (3) Du Pont's argument that he was unable to work is legally irrelevant.

We first briefly address the applicable standard of review. The findings and decision of the Board are considered prima facie correct. In an appeal of the Board's decision to the superior court the hearing is de novo, but without any evidence or testimony other than that included in the record filed by the Board. RCW 51.52.115; *Bayliner Marine Corp. v. Perrigoue,* 40 Wn. App. 110, 113, 697 P.2d 277 (1985) (quoting *Department of Labor & Indus. v. Moser,* 35 Wn. App. 204, 208, 665 P.2d 926 (1983)). Review in this court is controlled by RCW 51.52.140, which provides in part that "[a]ppeal shall lie from the judgment of the superior court as in other civil cases." *Moser,* at 208. Therefore, this court's role is to determine whether the trial court's findings, to which error is assigned, are supported

by substantial evidence and whether the conclusions of law flow therefrom. *Bayliner,* at 114.

Under this standard, we now address Metro's contention that the medical testimony in the record only supports the conclusion that the condition of Du Pont's knee was "fixed." Although the term "fixed" is not in the statutory definition of "permanent partial disability" as set forth in RCW 51.08.150,[3] it is a judicially imposed condition. *Pybus Steel Co. v. Department of Labor & Indus.,* 12 Wn. App. 436, 439, 530 P.2d 350 (1975). "Fixed" has been discussed in terms of permanence, signifying that the disability or physical condition is "unchangeable," *Hiatt v. Department of Labor & Indus.,* 48 Wn.2d 843, 846, 297 P.2d 244 (1956), "lasting," or "stable." *Hiatt,* at 846; *Wilson v. Department of Labor & Indus.,* 6 Wn. App. 902, 904, 496 P.2d 551 (1972).[4]

The relevant date in determining whether a condition is fixed is the date on which the closure order was issued. *Roberts v. Department of Labor & Indus.,* 46 Wn.2d 424, 425, 282 P.2d 290 (1955). Thus, we agree with Metro that testimony relating to what Du Pont's condition was *after* April 19, 1983, is irrelevant. It is uncontroverted, however, that on February 25, 1983, soon after Du Pont returned to work and before the closure order was issued, he returned to Dr. Peterson with complaints. Metro contends that Du Pont's subjective complaints cannot in and of themselves rise to the level of substantial evidence. We do not agree that the authorities cited by appellant in support of this proposition apply here. Du Pont's subjective complaints were made after an undisputed injury and after he had

---

[3]RCW 51.08.150 provides:

"'Permanent partial disability' means the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments were severed where repair is not complete, or any other injury known in surgery to be permanent partial disability."

[4]While the parties use the terms "palliative" and "curative" to discuss whether Du Pont's condition was fixed, a review of Washington case law does not disclose the use of these terms by the courts.

undergone significant surgery. Further, the complaints were made to his treating physician who was uniquely familiar with the case and believed they were true.

There was additional medical evidence to support the court's finding that Du Pont's condition was not fixed before April 19, 1983. While Dr. Tobin testified in his deposition that at the time of his February 3, 1983 examination, Du Pont's condition was fixed and that this claim should be closed, it is significant that Dr. Peterson's testimony is replete with instances of his refusal to draw this conclusion and his recognition of the incompatibility of medical and legal analyses. Furthermore, in response to the question of whether Du Pont's claim was closed prematurely, he stated: "It would certainly appear realistic to follow a patient for a period of months after their return back to work to see how their knee responds to the stress." He also testified that he usually followed a patient for a year after this type of surgery.

We note further that, unlike Dr. Tobin who only examined Du Pont once, Dr. Peterson was Du Pont's treating physician, had performed two arthroscopic procedures on Du Pont's knee, and was quite familiar with the case. The court could properly give greater weight to his testimony. Metro also contends, however, that Dr. Peterson's August 31 letter is legally irrelevant. While it was written after the closure date, this does not in itself determine the relevance of its content. Dr. Peterson draws certain conclusions based on indicia apparent before the April 19 closing date. The statement that Du Pont "has had trouble with his knee twice since his surgery" references by implication Du Pont's February 25 office visit. Furthermore, the letter goes on to state:

> I think that this man continues to have problems with his knees. I think that he probably should keep his claim open for another six months or so and at that time a closing examination could be performed.[5]

---

[5]We note parenthetically that Dr. Peterson's request to "keep [Du Pont's]

This constitutes relevant evidence in support of Dr. Peterson's conclusion that the condition was not fixed on April 19. Therefore, the trial court could properly draw such a conclusion from the evidence. *See Edwards v. Department of Labor & Indus.*, 43 Wn. App. 480, 483, 717 P.2d 1377 (1986).

We do not agree with Metro that the letter was based on inadmissible hearsay from Du Pont's counsel. Rather, it was based on Du Pont's visits to Dr. Peterson, and the information gained from the visits is admissible under ER 803(a)(4).

We reject Metro's argument that Du Pont's solid work attendance record belies a claim that the knee condition was not fixed. This is no more relevant than Du Pont's argument that his condition was not fixed because he was unable to work. There is no particular nexus between an attendance record and the medical determination of whether his condition is settled, permanent, or fixed.

While the evidence does conflict, the trial court's determination on conflicting evidence is decisive, and this court cannot substitute its judgment for that of the trial court, even if we were of the opinion that the factual dispute should have been resolved the other way. *Jacobs v. Brock*, 73 Wn.2d 234, 238, 437 P.2d 920 (1968). As the reviewing court, we must determine only whether the evidence most favorable to the prevailing party supports the challenged findings. *Xebek, Inc. v. Nickum & Spaulding Assocs.*, 43 Wn. App. 740, 742, 718 P.2d 851 (1986); *North Pac. Plywood, Inc. v. Access Rd. Builders, Inc.*, 29 Wn. App. 228, 232, 628 P.2d 482, *review denied*, 96 Wn.2d 1002 (1981). Under this standard, we determine that there was substantial evidence to support the trial court's finding that Du Pont's condition was not fixed.

We decline to grant Du Pont's request for attorney's fees

claim open," while technically incorrect since the claim was already closed, only evidences his unfamiliarity with the relevant procedures and does not diminish his medical expertise.

480

as this was not a frivolous appeal.
Affirmed.

RINGOLD, A.C.J., and WILLIAMS, J., concur.