[No. 56594-0-I. Division One. January 22, 2007.]

FRANK COLUCCIO CONSTRUCTION COMPANY, INC., *Respondent*, v. KING COUNTY, *Appellant*.

752

*Norm Maleng, Prosecuting Attorney*, and *Oma L. La Mothe, Deputy*; and *Stevan D. Phillips, Christina L. Haring*, and *Margarita V. Latsinova* (of *Stoel Rives, LLP*), for appellant.

*Bryan P. Coluccio* (of *Cable Langenbach Kinerk & Bauer, LLP*), for respondent.

¶1 DWYER, J. — King County hired Frank Coluccio Construction Co., Inc. (FCCC), as general contractor for a public works project involving construction of a small utility tunnel under the Duwamish Waterway. FCCC hired Donald B. Murphy Contractors, Inc. (DBM), as a subcontractor. DBM was responsible for constructing an access shaft at the eastern end of the tunnel. Problems arose during construction, including a "blow-in" of the access shaft. FCCC and DBM incurred substantial monetary losses resulting from repairs and delays.

¶2 Under the project contract, King County was obligated to purchase an insurance policy to "insure against physical loss or damage by perils included under an 'All Risk' Builder's Risk policy form." However, King County failed to obtain such insurance. When FCCC and DBM submitted builder's risk claims to King County in accordance with contractual requirements, King County denied the claims. Ultimately, FCCC sued King County, alleging, among other claims, that King County was liable for breaching the project contract by failing to obtain the builder's risk insurance. After a bench trial, FCCC prevailed on its claims and on DBM's pass-through claims. King County appeals from the judgment entered in FCCC's favor. We affirm.

I

¶3 King County undertook a public works project known as the "Alki Transfer/CSO Project West Duwamish Waterway Crossing, Contract W/F 6-95" (Project). King County hired FCCC as general contractor for the Project. FCCC

hired DBM as a subcontractor. The Project involved the construction of a small tunnel under the Duwamish Waterway for utility services. FCCC was responsible for constructing the tunnel. DBM was responsible for constructing an access shaft at the eastern end of the tunnel (East Access Shaft).

¶4 King County drafted the general conditions portion of the Project contract. The general conditions of the Project contract provide:

> The County will purchase and maintain property damage insurance upon the entire work, including materials and supplies, at the site, storage offsite or while in transit, to the insurable value thereof. The insurance shall include the interests of the County, the Contractor, subcontractors and sub-subcontractors of all tiers in the work and shall insure against physical loss or damage by perils included under an "All Risk" Builder's Risk policy form.[1]

Under the general conditions, King County assumed the right and responsibility of adjusting any claim under the builder's risk policy and to act as trustee for the insureds with regard to any payments made on such claims.

¶5 King County did not purchase a builder's risk insurance policy for the Project as mandated by the general conditions of the Project contract. During the Project, King County had a general property damage insurance policy through Arkwright Mutual Insurance Company[2] (Arkwright Policy).

¶6 DBM designed and constructed the East Access Shaft. The East Access Shaft wall was designed as a circular series of 34 interlocking columns, known as "piles,"

---

[1] All-risk insurance covers all risks that are not specifically excluded in the terms of the contract and takes the opposite approach of traditional policies, sometimes called "named perils" or "specific perils" policies, which exclude all risks not specifically named. 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:7 (3d ed. 1995). *See, e.g., Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (1996) (in all-risk insurance policy, "any peril that is not specifically excluded in the policy is an insured peril" (emphasis omitted)).

[2] The Arkwright Mutual Insurance Company is now doing business as Factory Mutual Insurance Company.

consisting of concrete poured into holes drilled in the ground. Following construction of the shaft wall, the shaft would be excavated and dewatered and a thick concrete slab placed at the bottom of the structure, approximately 60 feet below the ground surface. The first 33 piles were constructed without incident.

¶7 Although DBM employees followed the same construction methods and procedures used on the previously constructed piles, problems arose during the installation of the final pile, "Pile 8S." While the concrete was being pumped into the hole drilled for Pile 8S, the pipe used to convey concrete into the hole (the "tremie pipe") became stuck while the concrete level was 70 feet below surface level. DBM employees responded by taking remedial measures, continuing to pump concrete into the hole and attempting to remove the tremie pipe with a large crane. After the concrete pour was completed, the stuck tremie pipe was cut off at surface level and left embedded in the pile. Only 39.5 cubic yards of concrete was used to construct Pile 8S, approximately 12 cubic yards less than was used on comparable piles.

¶8 On January 9, 1998, as the shaft was being dewatered, a "blow-in" occurred. The shaft filled with water, soil, and debris. After the blow-in, a diver observed that Pile 8S and two adjoining piles were damaged and that the blow-in occurred in the area of this damage. Again, DBM employees were forced to take remedial action. After three failed attempts, DBM employees were eventually able to repair the shaft by freezing the ground around the shaft with liquid nitrogen. Thereafter, the shaft was successfully excavated and dewatered. The repairs delayed construction of the tunnel by two months. FCCC incurred expenses during the delay related to costs of equipment, site maintenance, and labor.

¶9 Following the blow-in, FCCC, King County, and Arkwright corresponded with each other about the builder's risk claims related to the East Access Shaft. King County denied the builder's risk claims on June 30, 1999. FCCC

and King County also corresponded about the fact that the Project would "close out" while the builder's risk claims were still pending. The general conditions of the Project contract provide:

> By accepting final payment, the Contractor shall be deemed thereby to have released the County from all claims of and all liability to the Contractor . . . other than timely written claims identified in detail and stated amounts that were submitted prior to the final payment and in strict compliance with the requirements of this Contract.

King County issued a warrant to FCCC, dated August 23, 1999, for final payment on the contract.

¶10 In August 1999, DBM filed an action against King County for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and implied contractual indemnity. King County moved for summary dismissal of DBM's claims. The trial court granted the motion. This court affirmed the dismissal, holding that DBM was not a third-party beneficiary to the contract and, thus, its claim for breach of the duties of good faith and fair dealing was properly dismissed because King County owed no contractual duty to DBM. *Donald B. Murphy Contractors, Inc. v. King County*, 112 Wn. App. 192, 194-98, 49 P.3d 912 (2002).

¶11 DBM then brought an action against FCCC for wrongful withholding of sums due under the subcontract. DBM and FCCC settled their dispute in December 2001 and entered into a settlement and joint prosecution agreement. This agreement provided that FCCC would sponsor and pass through DBM's builder's risk claim against King County.

¶12 FCCC subsequently initiated the present action, asserting claims against King County for breach of contract; promissory estoppel; implied indemnification; breach of the covenant of good faith and fair dealing; breach of fiduciary duties; tortious interference with FCCC's economic interests; and violation of the Washington Insurance

Code, Title 48 RCW. The trial court granted King County's motion for summary judgment on the tort claims, the Washington Insurance Code claim, and the implied indemnity and promissory estoppel claims. The claims for breach of contract and breach of the implied duty of good faith and fair dealing went to trial.

¶13 Before trial, pursuant to CR 56(d), the trial court ruled that no issues of material fact existed as to several issues and that the following matters had been established: (1) King County had a contractual duty to purchase and maintain property damage insurance for the Project, (2) the insurance King County was obligated to obtain was "required to be for physical loss or damage by perils included under an 'All Risk' Builder's Risk policy form," and (3) such insurance was to include the interests of FCCC and DBM.

¶14 Following an eight-day trial, the trial court ruled in FCCC's favor, entering extensive and detailed findings of fact and conclusions of law. The trial court's conclusions included the following:

> 2. King County breached its contractual obligation to provide All Risk Builder's Risk insurance coverage for the Project, including the interests of FCCC and DBM.
>
> 3. Losses described in the builder's risk insurance claim submitted by FCCC to the County (including the pass-through claims of DBM) would have been covered under the All Risk Builder's insurance coverage the County was obligated to purchase and maintain for the Project. To the extent the Arkwright Policy might have applied to the Project, the losses would have been covered under that Policy.
>
> 4. [King County's] affirmative defenses have not been established by the evidence, and are dismissed with prejudice.
>
> 5. FCC is entitled to an award of damages in an amount to be set, based upon property damage caused by the blow-in at the shaft and reasonable efforts to repair.

¶15 The trial court heard additional testimony and argument on the issue of damages and, on January 21, 2005, entered supplemental findings of fact and conclusions of

law pertaining to its award of damages. The trial court awarded FCCC total damages of $1,501,426.21, inclusive of prejudgment interest. The trial court held hearings on FCCC's motion for an award of attorney fees and costs and, on June 24, 2005, entered supplemental findings of fact and conclusions of law and awarded fees and costs to FCCC in the amount of $324,417.58.

¶16 King County appeals.[3]

## II

### A. Standard of review

¶17 When the trial court has weighed the evidence, we review factual matters to determine whether the trial court's factual findings are supported by substantial evidence and, if so, whether the findings support the conclusions of law and judgment. *Brin v. Stutzman*, 89 Wn. App. 809, 824, 951 P.2d 291 (1998). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise. *Brin*, 89 Wn. App. at 824 (quoting *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 819, 828 P.2d 549 (1992)). There is a presumption in favor of the trial court's findings, and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990). While the interpretation of an insurance contract is reviewed de novo as a question of law, *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 97 Wn. App. 335, 337-38, 983 P.2d 707 (1999), the establishment of the insured-insurer relationship is a question of fact.

### B. Breach of contract

¶18 King County assigns error to the trial court's findings of fact and conclusion of law determining that King County breached its contractual obligation to purchase and

---

[3] FCCC abandoned the cross-appeal it filed by raising no assignments of error in its briefing.

maintain all-risk builder's risk insurance covering work on the Project.[4] Specifically, King County claims that it was not in breach, contending that it proved that the Arkwright Policy covered the Project. The trial court found to the contrary, a finding which is supported by substantial evidence in the record.

 ¶19 Whether a party has breached a contract is a question of fact. *Palmiero v. Spada Distrib. Co.*, 217 F.2d 561, 565 (9th Cir. 1954) ("the question of breach of any contract, oral or written, is a question of fact to be left to the trier of fact"). *See Kohn v. Georgia-Pacific Corp.*, 69 Wn. App. 709, 725, 850 P.2d 517 (1993). The facts which the trial court found to be established on this issue include the following:

> **2.6** Contrary to [the] plain language of [the Project contract], King County did not purchase or maintain a builder's risk insurance policy specifically for the Project. During the Project, King County did have a general property damage insurance policy through Arkwright Mutual Insurance Company, now doing business as Factory Mutual Insurance Company (the "Arkwright Policy"). . . . However, the Court finds that during the Project, and both before and after receipt of the FCCC/DBM builder's risk claim, the County itself acknowledged that the Arkwright Policy did not fulfill the County's contract obligation to have an All Risk Builder's Risk policy for the Project. . . .
>
> . . . .
>
> **4.2.1** The Project was not covered under the Arkwright policy, for two reasons: (1) when the policy was issued in June, 1996, the County had specifically requested that underground pipelines, tunnels, and detention and retention structures be excluded coverage (this decision was made in order to save insurance premium costs to the County); and (2) the Project was not a scheduled property under the policy for coverage purposes.

---

[4] King County assigns error to the trial court's findings of fact 2.6, 4.2.1, 4.2.2, 4.3, 4.4, 4.4.1, 4.4.2, 4.5, 4.6, 4.7, 4.10, 4.12, 4.13, 4.14, 4.16, 5.3, and conclusion of law 2 from the findings and conclusions entered August 31, 2004.

The trial court also made several factual findings concerning King County's deputy risk manager, Kevin Mitchell, who testified at trial.

**4.3** . . . Mr. Mitchell was unable to reasonably explain why the Project was omitted, or why the entire Alki Transfer/LSO Control Facilities program was omitted, where other similar construction projects were included in the policy's schedule of properties . . . . This indicates the county failed to include the Project under the Arkwright Policy as required by the contract.

**4.4** Mr. Mitchell testified that he had repeatedly advised Arkwright of this misunderstanding and mistake. However, there is no written communication from Mr. Mitchell to Arkwright or Factory Mutual describing or identifying this mistake or misunderstanding, and Mr. Mitchell testified at trial that any such communications were verbal only. The Court finds Mr. Mitchell's explanation not to be credible . . . .

¶20 The trial court's findings of fact are supported by substantial evidence in the trial record. As the trial court noted in its findings of fact, the Project was not listed as a scheduled property for coverage purposes under the Arkwright Policy and the policy contained an express exclusion, as requested by King County, for underground pipelines, tunnels, and detention and retention structures. Furthermore, the trial court found that "both before and after receipt" of the claim, "the County itself acknowledged that the Arkwright Policy did not fulfill the County's contract obligation to have an All Risk Builder's Risk policy for the Project." This finding of fact is supported by substantial evidence in the record, including the evidence cited by the trial court.[5] In addition, the trial court's conclusion of law that "King County breached its contractual obligation to provide All Risk Builder's Risk insurance coverage for the Project, including the interests of FCCC and DBM," is

---

[5] Finding of fact 2.6 refers specifically to trial exhibit 107, a facsimile transmission Mitchell sent to Arkwright after the contract with FCCC was formed but before the blow-in occurred. The communication references King County's contractual requirement to provide all-risk builder's risk coverage for the Project and inquires whether Arkwright would be able to provide such coverage.

supported by the trial court's findings of fact.[6] There was no error.

## C. Breach of implied duties

¶21 The trial court also found that King County breached its implied duties of good faith and fair dealing in its handling of the builder's risk claim. King County asserts that this was error.[7]

¶22 There is an implied duty of good faith and fair dealing in every contract. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty obligates the parties to cooperate with one another so that each may obtain the full benefit of performance. *Metro. Park Dist. v. Griffith*, 106 Wn.2d 425, 437, 723 P.2d 1093 (1986). The trial court made specific factual findings, based on substantial evidence, concerning King County's breach of its implied duties under the Project contract, including:

> **5.2** According to the County's insurance expert, Donald Malecki, the County adjusted the FCCC/DBM builder's risk claim. . . . Mr. Malecki testified as to the duties of an adjuster: determine the events giving rise to the loss; the nature of the loss; whether it is not covered; and to the extent covered, to adjust according to the dictates of the policy; if it is not covered, deny it with reasons. Andy Shemchuk, a[n] experienced insurance adjuster, testified that an adjuster is to be neutral, and obligated to resolve claims objectively. . . . As to the insureds for builder's risk coverage on the Project, FCCC and DBM, they had a reasonable expectation that an insurance claims [sic] would be adjusted in accordance with the standard rules governing claims, such as those described by Mr. Shemchuk and those set forth in insurance regulations·. . . .
>
> . . . .

---

[6] The trial court was not bound to accept as true the testimony of King County's witnesses. *Brewer v. Copeland*, 86 Wn.2d 58, 74, 542 P.2d 445 (1975). Determining the truth from competing evidence is a basic function of a trial court. *Du Pont v. Dep't of Labor & Indus.*, 46 Wn. App. 471, 479, 730 P.2d 1345 (1986).

[7] King County challenges findings of fact 5, 5.2, 8, 8.1, 8.2, 8.2.1, 8.2.1.1, 8.2.1.2, 8.2.2, 8.2.2.2, 8.2.2.4, 8.2.2.5, 8.4, 8.5, and 8.6 from the findings and conclusions entered August 31, 2004.

**8.1** The County, by its actions, also violated its implied duty of good faith and fair dealing. Rather than fulfilling these contractual duties, the County elected and pursued a course intended only to protect the County's position and interests, to the detriment of FCCC and DBM. This course continued in the County's later dealings with Arkwright through its successor, Factory Mutual Insurance Company ("Factory Mutual"). Through these dealings, the County, acting for its benefit "colluded" with Factory Mutual to assure that the FCCC/DBM builder's risk claims would be excluded from any insurance coverage that might be afforded under the Arkwright Policy.

. . . .

**8.2.2** The County also facilitated the insurance company's defenses to coverage for the builder's risk losses; rather than advancing and advocating or adjusting the FCCC/DBM builder's risk claims, which was its contractual duty, the County secretly met with Factory Mutual representatives on several occasions following the December, 1999 claim notice. . . .

. . . .

**8.2.2.2** The County's protection of its self-interests are best reflected in two documents admitted into evidence at trial: a July 6, 2000 letter from the King County Prosecutor's Office to counsel for Factory Mutual, and notes kept by Keith Mitchell during a conference call involving County and Factory Mutual representatives on July 20, 2000.

**8.2.2.3** In the July 6, 2000 letter King County asks Factory Mutual to work with the County as "allies" in defense of the then-pending DBM lawsuit. Among other things, the County asks Arkwright to assist in defending against DBM's claim that the County had failed to purchase and maintain the appropriate all risk builder's risk insurance for the Project. . . .

**8.2.2.4** A telephone conference call involving County and Factory Mutual representatives took place on July 20, 2000. . . . The purpose of the conference call was to discuss the DBM lawsuit, as reflected in the title given by Mr. Mitchell to his notes. In his notes, Mr. Mitchell characterized the conduct of the County and Factory Mutual as involving, in his word, "COLLUSION." The parties discussed how Arkwright could assist in coordinating the defense of the lawsuit . . . . The parties also discussed the supplementation of Factory Mutual's

initial denial letter of June 9, 2000, fixing it to say that the Arkwright Policy did apply to the Property. This would allow the County to argue that it did not breach the Project contract.

(Citations omitted.) King County argues that, because there was no insurance coverage for the claims of FCCC and DBM, King County's handling of the insurance claims could not, as a matter of law, violate its duty of good faith and fair dealing. We disagree.

¶23 King County had at least three pertinent contractual obligations subject to the implied duties of good faith, including: (1) the duty to procure and maintain all-risk builder's risk insurance, (2) the duty to promote and sponsor FCCC and DBM's builder's risk claims, and (3) the duty to adjust claims brought under the all-risk policy.

¶24 The evidentiary record demonstrates that King County was dishonest in fact and precluded FCCC from receiving the full benefit of performance under the Project contract by falsely representing that it had procured an all-risk policy for the Project in its June 30, 1999 letter of denial, by failing to adjust the builder's risk claims in good faith, and by colluding with Arkwright to avoid coverage. Such behavior plainly contravened King County's duties of good faith and fair dealing, which exist to promote "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981).

¶25 Substantial evidence supports the trial court's findings of fact pertinent to this issue. Those findings of fact support the trial court's conclusion of law. The trial court did not err in ruling on this issue.

*D. King County's liability*

¶26 The trial court properly determined that King County failed to purchase the required insurance coverage and that this constituted a breach of King County's contract with FCCC. Where a party fails to provide insurance in accordance with the terms of a contract, the breaching

party assumes all risks of loss. *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232-33 (Fed. Cir. 1997) (quoting *Borough of Wilkinsburg v. Trumbull-Denton Joint Venture*, 390 Pa. Super. 580, 568 A.2d 1325, 1326 (1990)). Damages recoverable for such a breach are the full amount that would have been covered by insurance, had the breaching party performed as specified. *Mass. Bay*, 129 F.3d at 1233.

¶27 King County, therefore, was liable for the full amount of losses that would have been covered by the all-risk builder's risk policy it was obligated to purchase. "All-risk" insurance is a promise to pay upon the fortuitous and extraneous happening of loss or damage from any cause whatsoever unless that cause is specifically excluded. *Churchill v. Factory Mut. Ins. Co.*, 234 F. Supp. 2d 1182, 1187-88 (W.D. Wash. 2002). Under an all-risk policy, any risk that is not specifically excluded is an insured peril. *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (1996). The purpose of such insurance is to shift the risk of loss away from the contractor and the owner and to place it upon an insurer. *See S. Tippecanoe Sch. Bldg. Corp. v. Shambaugh & Son, Inc.*, 182 Ind. App. 350, 395 N.E.2d 320 (1979).

¶28 To recover, FCCC bore the burden of proving that the losses suffered would have been covered under an all-risk builder's risk policy, had one been purchased. Once FCCC met its burden, the burden then shifted to King County to prove that an applicable policy exclusion would have removed the losses from coverage. *Pub. Employees Mut. Ins. Co. v. Rash*, 48 Wn. App. 701, 703-04, 740 P.2d 370 (1987). In the absence of such proof, King County remained responsible for the losses suffered. *Mass. Bay*, 129 F.3d at 1226.

*1. FCCC's burden to demonstrate fortuity*

¶29 As a condition precedent to coverage under an all-risk builders' risk insurance policy, the loss-causing instrumentality must have been brought about as the

result of a "fortuitous event."[8] The trial court determined that FCCC met its burden of proof, establishing that its losses were "fortuitous" and, therefore, would have been covered by an all-risk builder's risk policy, had one been purchased. King County assigns error to the trial court's findings of fact and conclusions of law on this issue.[9] There is no error.

¶30 "The burden of demonstrating fortuity is not a particularly onerous one." *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980). The determination of whether a loss is "fortuitous" has three components:

> "(a) a loss which was certain to occur cannot be considered fortuitous, and may not serve as the basis for recovery under an all-risk insurance policy;
>
> "(b) in deciding whether a loss was fortuitous, a court should examine the parties' perception of risk at the time the policy was issued;
>
> "(c) ordinarily, a loss which could not reasonably be foreseen by the parties at the time the policy was issued is fortuitous."

*Churchill*, 234 F. Supp. 2d at 1188-89 (quoting *Underwriters Subscribing to Lloyd's Ins. Certificate No. 80520 v. Magi, Inc.*, 790 F. Supp. 1043, 1048 (E.D. Wash. 1991)). The test for fortuity is a subjective, not objective, one and involves questions of fact. *Hillhaven Props. Ltd. v. Sellen Constr. Co.*, 133 Wn.2d 751, 758, 948 P.2d 796 (1997) (applying analogous principle that " 'an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased' " (quoting *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994))); *Pub. Util. Dist. No. 1*, 124 Wn.2d at 805-06 (same).

---

[8] 7 RUSS & SEGALLA, *supra*, § 101:7. *Accord McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731 n.5, 837 P.2d 1000 (1992) (all-risk homeowners' policy).

[9] Specifically, King County challenges findings of fact 3.1, 3.3, 3.3.1, 3.3.2, 3.3.3, 3.3.5, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, and conclusion of law 3 from the findings and conclusions entered August 31, 2004.

¶31 The facts which the trial court found to be established as to the events giving rise to the losses described in FCCC's and DBM's builder's risk claims include the following:

**3.1** . . . Both the tremie pipe situation and the later blow-in were fortuitous events, giving rise to the builder's risk claims at issue in this case. . . .

. . . .

**3.3** . . . [T]he Court finds that the blow-in was not caused by or the result of any faulty workmanship on the part of DBM. The damage to the shaft, and the resulting loss, was fortuitous.

. . . .

**3.3.3** At a depth where the concrete was about 70 feet from the surface, the tremie pipe became stuck. In the words of the County's expert, Mr. Henn, it would be pure speculation as to why or how the pipe became stuck. Up until that point in time, Mr. Henn confirmed that in his opinion, DBM followed all appropriate construction means and methods in the construction of Pile 8S. There was nothing faulty as to DBM's workmanship up to the point of when the pipe became stuck. Not a single witness testified as to how or why the tremie pipe became stuck. In Mr. Powell's words, " . . . it was as if a big hand just grabbed onto the pipe and wouldn't let go."

. . . .

**3.10** To establish that an insured loss occurred, FCCC need only show that the loss was "fortuitous." . . . There is no factual dispute that FCCC and DBM suffered losses on the Project as a result of (1) the tremie pipe event, and (2) the shaft blow-in event, both of which resulted in actual damages. The Court finds that the losses were fortuitous.

. . . .

**3.12** The facts demonstrate that the losses suffered by FCCC and DBM were not certain to occur and could not have been reasonably foreseen at the time the Project Contract was signed, or during construction. The losses were fortuitous.

**3.13** The Court finds that FCCC has met its burden of showing that the losses arising from the damage to the shaft were subject to builder's risk coverage under an all risk policy. . . .

**3.14** . . . As explained by FCCC's insurance expert, Kay Thorne, any damages to or loss of use of the shaft, including the tremie pipe event and later blow-in, were events that should have been covered by insurance.

The most critical finding of fact is the trial court's determination that "it would be pure speculation as to why or how the [tremie] pipe became stuck." This finding is consistent with the testimony of King County's expert witness, Ray Henn, who testified that no witness was in a position to explain with any reasonable probability why the tremie pipe became stuck.[10]

¶32 During the trial, "[t]he trial court heard and saw the witnesses, and was thus afforded an opportunity, which is not possessed by this court, to determine the credibility of the witnesses." *Garofalo v. Commellini*, 169 Wash. 704, 705, 13 P.2d 497 (1932). The trial court's credibility determinations and its resolution of the truth from conflicting evidence will not be disturbed on appeal. *Garofalo*, 169 Wash. at 705 (credibility); *Du Pont v. Dep't of Labor & Indus.*, 46 Wn. App. 471, 479, 730 P.2d 1345 (1986) (resolving truth from conflicting evidence).

¶33 The trial court's findings of fact concerning the fortuitous nature of the losses suffered are supported by substantial evidence. These factual findings support the trial court's conclusions of law on this issue.[11] There was no error.

---

[10] King County complains about the trial court's finding of fact 3.3, which states, "Not a single witness testified as to how or why the tremie pipe became stuck." Although this appears to be an overstatement, it does not furnish any basis for appellate relief. Inherent in the trial court's remaining findings is the trial court's rejection of any testimony as to how or why the tremie pipe became stuck as speculative, a finding that is within its prerogative as the finder of fact and which we do not disturb. *Du Pont*, 46 Wn. App. at 479.

[11] The trial court's determination that a specific cause of the losses had not been proved necessarily defeats King County's arguments to the contrary. Whatever the evidence King County produced on this question, the trial court did not find it sufficiently probative to be convincing. Such determinations fall squarely within the province of the trial court. *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). King County's argument that the losses were caused by problems inherent to Pile 8S or by the natural behavior of the construction materials employed fails for the same reason.

*2. King County's burden to prove an applicable exclusion*

¶34 King County failed to meet its burden of proof at trial to demonstrate that an applicable exclusion would have removed the losses from coverage. Specifically, the trial court rejected King County's assertion that the losses claimed by FCCC fell within a "faulty workmanship" exclusion. King County asserts that this determination was erroneous.[12] We disagree.

¶35 The difficulty for King County, of course, is proving the existence and terms of an exclusion in an insurance policy it never purchased. Obviously, had King County honored its contractual obligation to purchase an all-risk insurance policy, all applicable exclusions would be found in the policy itself. However, where, as here, an owner breaches its duty to a contractor to purchase insurance, the owner bears the burden of proving by a preponderance of the evidence what exclusions, if any, would have been included in the policy it was obligated to secure.[13]

¶36 This is not an impossible burden. In many instances, the construction contract itself will identify exactly the policy to be purchased and from which insurer it is to be purchased. In other instances, the owner and the contractor will have an established course of dealing. In such a situation, the best evidence of that which was intended to be purchased will be that which was purchased in the past. The more difficult situation is the one we have here, i.e., the construction contract does not specify the insurance policy to be purchased, only the type of insurance to be purchased, and King County did not prove an established course of dealing with FCCC. How, then, can King County be fairly

[12] King County challenges findings of fact 7, 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6 from the findings and conclusions entered August 31, 2004.

[13] As discussed above, the trial court concluded that King County colluded with Arkwright to attempt to falsely show that an Arkwright Policy applied to satisfy King County's obligation. The trial court found that claim to be false. It also noted that the policy at issue was not an all-risk builder's risk policy but, rather, was a general property damage policy. Because the Arkwright Policy did not apply and because it is not a true all-risk builder's risk policy, King County did not meet its burden of proof on this issue merely by introducing an Arkwright Policy at trial and subsequently referring to its contents during the course of the proceeding.

allowed to prove the applicability of an insurance coverage exclusion it never purchased?

¶37 FCCC urges us to follow the rule applied in *Steamboat Development Corp. v. Bacjac Industries, Inc.*, 701 P.2d 127 (Colo. Ct. App. 1985), in which the Colorado Court of Appeals held that in circumstances such as this, the owner, having failed to obtain the required insurance policy, is liable for the full amount of the contractor's losses suffered, without the opportunity to demonstrate that the losses might have been excluded by a provision of the insurance policy, had one been purchased. The purpose underlying this approach is that the owner—having failed to act—should not be allowed to avoid liability by "shopping after the fact," locating insurance policies for sale which contain desired exclusions and then claiming that just such a policy is what the owner intended all along to purchase, even though it never did so. Allowing such behavior is clearly inconsistent with Washington's long-established policy of encouraging compliance with contractual obligations. *Neis v. O'Brien*, 12 Wash. 358, 361, 41 P. 59 (1895). The approach utilized by the Colorado Court of Appeals, on the other hand, is consistent with that policy by creating a severe disincentive to owners contemplating breaching a contractual obligation to purchase insurance coverage for the benefit of a contractor.

¶38 Nevertheless, we think it a better approach to afford the owner the opportunity to prove that every insurance policy it could have purchased to satisfy its obligation, without exception, would have excluded the losses claimed. Adoption of this approach precludes a windfall to a nonbreaching contractor for losses suffered that no available policy would have covered. This approach also properly denies the owner the opportunity to avoid liability by engaging in after-the-fact "policy shopping."[14] Further-

---

[14] An approach that would afford a breaching party the opportunity to engage in after-the-fact "policy shopping" would be unsound, as the fact that the party did not, in fact, obtain such a policy is the best evidence that the party did not actually intend to obtain such a policy.

more, this rule is consistent with the purpose of all-risk insurance, which is to shift the risk of loss away from the insured and to place it upon an insurer. *See S. Tippecanoe Sch. Bldg. Corp.*, 395 N.E.2d at 327.

¶39 Accordingly, King County could only escape liability for the losses suffered by proving at trial that every all-risk builder's risk insurance policy available for purchase, without exception, would have excluded the losses claimed by FCCC and DBM. To do so, King County had to prove both that all such policies contain "faulty workmanship" exclusions and that the losses suffered by FCCC and DBM fell within the provisions of such an exclusion. However, a preeminent treatise indicates that it would have been impossible for King County to make such a showing at trial:

> A builder's risk policy has been held to cover damages occasioned by the insured's poor workmanship, despite the insurer's contention that poor workmanship could not constitute an "accident" within the meaning of the policy. Risks which have been determined to be covered "accidents" within the meaning of builder's risk policies include water damage occasioned by the removal of a roof, and by the mislocation of a home on a lot, as well as damages arising out of the collapse of all or part of the structure upon which the insured was laboring, and the expenses involved in replacing broken pipe and repairing leaking collars improperly installed by the builder's employees. Even where the negligence of others is more productive of the loss than the contractor's negligence, coverage exists under the policy.

9A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 132:21, at 132-28 to -29 (3d ed. 1995) (footnotes omitted) (citing *Associated Eng'rs, Inc. v. Am. Nat'l Fire Ins. Co.*, 175 F. Supp. 352 (N.D. Cal. 1959); *Gen. Accident Ins. Co. of Am. v. Manchester*, 116 A.D.2d 790, 497 N.Y.S.2d 180 (1986); *Boggs v. Aetna Cas. & Sur. Co.*, 272 S.C. 460, 252 S.E.2d 565 (1979); *Lee v. U.S. Fid. & Guar. Co.*, 272 Or. 638, 538 P.2d 359 (1975)). In addition, several reported cases discuss the applicability of all-risk builder's risk insurance coverage in disputes stemming from all-risk insurance

policies which did not contain "faulty workmanship" exclusions. *See N-Ren Corp. v. Am. Home Assurance Co.*, 619 F.2d 784 (8th Cir. 1980) (design defect held to be "extraneous"); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 195-97 (D. Conn. 1984); *The Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F. Supp. 978, 987-88 (S.D. Ohio 1975); *Associated Eng'rs, Inc.*, 175 F. Supp. 352. It is clear that not every all-risk builder's risk insurance policy contains a "faulty workmanship" exclusion.

¶40 In fact, the evidence adduced at trial was that all-risk builder's risk policies vary considerably. King County's insurance expert witness, Donald Malecki, testified that an insured "can get a very, very limited" all-risk builder's risk policy and that "you have to tailor your coverage according to your needs." He also explains that insureds can "create their own monster" by negotiating a "manuscript" policy comprised of provisions from various policies.

¶41 Moreover, even if King County had been able to prove that every all-risk builder's risk policy it could have purchased would have included a "faulty workmanship" provision, the trial court determined that "there was no faulty workmanship on the part of DBM that would fall under any exclusion." In connection with this determination, the trial court found the following facts to be established:

> **7.1** Although it was never reason for the June 30, 1999 claim denial, the County now contends that FCCC's loss should be excluded because the Arkwright Policy does not cover "faulty workmanship." For purposes of discussion, if the Arkwright Policy were to apply, the exclusion states:
>
> > Faulty workmanship, material, construction or design from any cause; all unless physical damage not excluded by this Policy results, in which event, this Policy will cover only such resulting damages.
>
> The faulty workmanship exclusion does not apply here, because there is no evidence supporting application of the exclusion, i.e., there is no evidence of faulty workmanship.

**7.2** As stated above, the peril was fortuitous, not the result of faulty workmanship, material, construction or design.

**7.3** Not a single witness can explain how or why the tremie pipe in fact became stuck. To paraphrase the words of the County's expert, Ray Henn, " . . . that would require speculation on my part, the County's part, and the contractor's part." The only accepted explanation is that of DBM's project superintendent, Digger Powell: "It was like a big hand just grabbed onto the pipe." In other words, the only evidence is that the problems with Pile 8S resulted from an act of God, which is a covered event and peril.

**7.4** The Court finds that there was no faulty workmanship on the part of DBM that would fall under any exclusion found in either [sic] the Arkwright Policy (had it covered the Project).

**7.5** Resulting or ensuing loss provisions in insurance policies also cover damage that not only follows but is also *caused by* faulty work.

**7.6** The Court finds that even if the problems with Pile 8S were due to faulty work, the resulting damages to the shaft, including the blow-in, were covered under the Arkwright Policy (that should have applied to the Project).

(Citations omitted.) King County contends that the trial court's analysis of whether DBM's actions constituted "faulty workmanship" under a "faulty workmanship" exclusion, had one applied, was erroneous. We disagree.

¶42 King County argues that since it contracted to obtain a watertight access shaft and DBM failed to provide one, DBM should not be awarded the repair costs incurred to fix the access shaft. King County states that the proper approach to analyzing "faulty workmanship" is to focus on whether the workmanship "produces a product that does not meet contract specifications,"[15] referring to such an approach as the "contract standard."[16] King County asserts that the trial court, by focusing on the "means and methods" by which DBM constructed the access shaft, employed a "tort" or "negligence standard" for determining faulty

[15] Appellant's Br. at 36.

[16] Appellant's Br. at 31.

workmanship. King County argues that the trial court's use of a "negligence standard" was erroneous.[17] King County argues that the trial court's findings failed to address the "contract standard" and that the evidence adduced at trial demonstrates that DBM's workmanship did not meet the "contract standard."

¶43 However, courts throughout the nation have taken differing approaches. Many courts have, in fact, applied the "negligence" standard, holding that builder's risk policies "cover damages occasioned by the insured's poor workmanship," 9A RUSS & SEGALLA, *supra*, § 132:21, at 132-28 (citing *Associated Eng'rs*, 175 F. Supp. 352), and that "faulty workmanship" means " 'the faulty or defective execution of making or doing something.' " *L.F. Driscoll Co. v. Am. Prot. Ins. Co.*, 930 F. Supp. 184, 187 (E.D. Pa. 1996) (quoting *Kroll Constr. Co. v. Great Am. Ins. Co.*, 594 F. Supp. 304, 307 (N.D. Ga. 1984)).[18] Furthermore, undefined terms in a policy are interpreted by courts based on their ordinary meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507 (1990). To divine the meaning of undefined terms in policy exclusions, both the process and the final result of courts' analyses frequently depend on the particular text of a given exclusion. Because no actual written policy exclusion exists in the instant dispute, such textual analyses cannot be performed. Moreover, because the exclusionary language in all-risk builder's risk policies

---

[17] King County cites to the following cases as examples of courts applying the "contract standard": *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501 (5th Cir. 2000); *Allstate Ins. Co. v. Smith*, 929 F.2d 447 (9th Cir. 1991); *Fu-Kong Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338 (9th Cir. 1989); *U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459 (5th Cir. 1982); *City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F. Supp. 2d 663 (D. Vt. 2002); *Kroll Constr. Co. v. Great Am. Ins. Co.*, 594 F. Supp. 304 (N.D. Ga. 1984); *Schultz v. Erie Ins. Group*, 754 N.E.2d 971 (Ind. Ct. App. 2001).

[18] In *L.F. Driscoll*, the court found the phrase "faulty workmanship" to be "unambiguous" and relied "on its plain, ordinary meaning rather than straining to justify a liberal interpretation of the phrase." 930 F. Supp. at 187. The court determined that "[t]he plain and ordinary meaning of 'faulty or defective workmanship' is 'the faulty or defective execution of making or doing something.' " *L.F. Driscoll*, 930 F. Supp. at 187 (quoting *Kroll Constr.*, 594 F. Supp. at 307).

varies considerably from policy to policy, we are skeptical of King County's claim that either a "negligence" or a "contract" standard can be imposed as a matter of law. Nevertheless, in the absence of actual applicable policy language to examine, this case does not present a proper occasion for us to attempt to determine, as a matter of law, whether under Washington law either the "negligence standard" or the "contract standard" is the only correct criterion for interpreting a "faulty workmanship" provision.

¶44 To meet its burden at trial, King County had to prove: (1) that every all-risk builder's risk policy, without exception, contains a "faulty workmanship" exclusion and (2) that every "faulty workmanship" exclusion, without exception, would only be interpreted consistent with the "contract standard." King County proved neither.

¶45 Applying the "negligence standard," the trial court found that the work performed was not proved to be "faulty." This finding is supported by substantial evidence in the record. There was no error.

### 3. Ensuing loss provision

¶46 The Arkwright Policy's "faulty workmanship" provision excluded from coverage "faulty workmanship, material, construction or design from any cause; all unless physical damage not excluded by this Policy results, in which event, this policy will cover only such resulting damage." This provision of coverage for damage caused by the excluded "faulty workmanship" is referred to as an "ensuing loss" provision or a "resulting loss" provision.

¶47 Based on this provision in the Arkwright Policy, the trial court, as an alternative basis for decision, concluded that "even if the problems with Pile 8S were due to faulty work, the resulting damage to the shaft, including the blow-in," would have been covered by the all-risk policy which should have been purchased. King County asserts that the trial court erred in interpreting the ensuing loss provision, arguing that such a provision does not cover "repairs necessitated by the defective construction of the

access shaft" but is limited to damage the faulty workmanship causes to other property.[19] However, the trial court ruled that King County did not prove that a "faulty workmanship" exclusion applied to the losses suffered, a decision we affirm. Therefore, resort to an "ensuing loss" provision is unnecessary. Thus, we need not engage in a further review of the trial court's ruling on this issue.

### 4. FCCC's labor and equipment costs

¶48 In its supplemental findings of fact and conclusions of law, dated January 21, 2005, the trial court ruled that FCCC was entitled to its expenses that were "based on its labor efforts and expenses necessary to remain ready on the project for tunnel boring."[20] King County asserts that the trial court erred by awarding these damages.[21] We disagree.

¶49 The trial court heard testimony of expert witnesses, including a senior construction manager for King County's Department of Natural Resources Waste Water Treatment Division, James Benedict, and FCCC's insurance expert, Kay Thorne, and considered insurance policy provisions, such as those included in the Arkwright Policy, concerning FCCC's right to recover expenses resulting from the blow-in. Benedict testified that the west access shaft had to be maintained to protect both the shaft and the tunnel boring machine. Benedict also acknowledged that the shaft and the tunnel boring machine had to be ready for construction activity immediately upon completion of the East Access Shaft repairs. Thorne testified that FCCC's expenses would have been covered losses under "preservation of property" and "expediting expense" provisions in a property insurance policy.

---

[19] King County challenges findings of fact 7.5 and 7.6 from the findings and conclusions entered August 31, 2004.

[20] The court also expressly concluded that "FCCC may not recover costs for delay, loss of market, business interruption, or other indirect or remote costs."

[21] King County challenges findings of fact 15 through 18 and conclusions of law 1, 4, and 6 from the supplemental findings and conclusions entered January 24, 2005.

¶50 On appeal, King County argues that these losses would not be covered under either type of clause. In support of its argument that such losses are not recoverable as "preservation of property" expenses, it cites only to an unpublished North Dakota opinion. However, the trial court entered findings of fact, supported by substantial evidence, that such losses qualified as "either an expediting expense or for protection of property coverage." King County's failure to adequately challenge the trial court's findings as to "protection of property" negates its argument on this issue. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). There was no error.

*E. Attorney fees*

¶51 King County next asserts that the trial court erred in awarding FCCC $324,417.58 in attorney fees and costs pursuant to RCW 39.04.240.[22] King County argues that the trial court exceeded its statutory authority by awarding FCCC attorneys fees and costs that were billed by attorneys

---

[22] "The provisions of RCW 4.84.250 through 4.84.280 shall apply to an action arising out of a public works contract in which the state or a municipality, or other public body that contracts for public works, is a party, except that: (a) The maximum dollar limitation in RCW 4.84.250 shall not apply; and (b) in applying RCW 4.84.280, the time period for serving offers of settlement on the adverse party shall be the period not less than thirty days and not more than one hundred twenty days after completion of the service and filing of the summons and complaint." RCW 39.04.240(1). "[T]here shall be taxed and allowed to the prevailing party as a part of the costs of the action a reasonable amount to be fixed by the court as attorneys' fees." RCW 4.84.250. "The plaintiff . . . shall be deemed the prevailing party within the meaning of RCW 4.84.250 when the recovery, exclusive of costs, is as much as or more than the amount offered in settlement by the plaintiff." RCW 4.84.260. "Offers of settlement shall be served on the adverse party in the manner prescribed by applicable court rules at least ten days prior to trial. Offers of settlement shall not be served until thirty days after the completion of the service and filing of the summons and complaint. Offers of settlement shall not be filed or communicated to the trier of the fact until after judgment, at which time a copy of said offer of settlement shall be filed for the purposes of determining attorneys' fees as set forth in RCW 4.84.250." RCW 4.84.280.

to DBM, an entity that was not a party to the litigation.[23] King County cites to no controlling cases in support of its argument. In any event, we disagree.

¶52 We review the trial court's award of attorney fees and costs for abuse of discretion. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987). King County accurately states that the apposite statutes are silent as to pass-through claims of the type brought by DBM and FCCC in this case. However, RCW 4.84.250, made applicable to FCCC and King County through RCW 39.04.240, provides simply that "there shall be taxed and allowed to the prevailing party as a part of the costs of the action a reasonable amount to be fixed by the court as attorneys' fees." FCCC was the only named plaintiff and was the prevailing party at trial. The statute requires only that the prevailing party be awarded a "reasonable amount to be fixed by the court." King County does not challenge the reasonableness of the award.[24] Furthermore, whether FCCC incurred the expenses itself is irrelevant to our resolution of this issue, as evidenced by cases which recognize that attorney fees may be awarded to a party who received the assistance of pro bono counsel. *Blair v. Wash. State Univ.*, 108 Wn.2d 558, 570-71, 740 P.2d 1379 (1987). Thus, the fact that FCCC litigated the instant action pursuant to a contractual agreement with DBM did not compel the trial court to reach a different result. The work performed by the attorneys was performed in order to assist FCCC in prevailing at trial. The fact that, by contract, DBM was primarily responsible for the payment of some of the fees does not render the work performed noncompensable. The trial court's ruling is affirmed.

¶53 Finally, FCCC requests an award of attorney fees and costs on appeal pursuant to RCW 39.04.240, which

---

[23] King County challenges findings of fact 1, 5, 8, 9, and 10, as well as conclusions of law 1, 2, and 3 from the second supplemental findings of fact and conclusions of law entered June 24, 2005.

[24] The record reflects that the trial court used the "lodestar" approach, which multiplies "a reasonable hourly rate by the number of hours reasonably expended." *Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 124, 786 P.2d 265 (1990).

specifically incorporates RCW 4.84.250 through RCW 4.84.280. *Absher Constr. Co. v. Kent Sch. Dist. No. 415,* 79 Wn. App. 841, 917 P.2d 1086 (1995) (applying RCW 39.04.240 on appeal). FCCC's request for attorney fees on appeal is granted, subject to compliance with RAP 18.1(d). A commissioner of this court will make the necessary award.

¶54 Affirmed.

COLEMAN and GROSSE, JJ., concur.