2003 ME 29

**Cheryl WRENN**

v.

**David LEWIS.**

Supreme Judicial Court of Maine.

Submitted on Briefs: April 18, 2002.
Decided: March 5, 2003.

C.H. Spurling, Gardiner, for plaintiff.

Karen E. Boston, Lipman & Katz, P.A., Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] David Lewis appeals from the judgment entered in the District Court (Augusta, *Worth, J.*) finding him in contempt for his failure to pay spousal support, granting his motion to reduce child support in part, and denying his motion to eliminate spousal support. David's primary assertions are the court erred when it (1) found that he remained voluntarily unemployed following the loss of his job, and (2) imputed an income of $50,000 per year to him based upon job opportunities that would have required him to move to another region of the country or to Mexico. We discern no error in the court's finding that David was voluntarily unemployed, but conclude that the court erred in its determination of David's earning capacity. We, therefore, vacate the court's order and remand for further proceedings.

## I. BACKGROUND

[¶ 2] David and Cheryl were divorced in April of 1998 (Augusta, *Vafiades, J.*). They were awarded shared parental rights and responsibilities for their son and daughter, with Cheryl being allocated the primary residential care of the children. At the time of the divorce, David had worked at Carleton Woolen Mills for twenty-three years and was earning $63,000 a year, and Cheryl performed part-time housecleaning earning $4800 a year. The divorce judgment required David to: (1) pay child support in the amount of $228.76 per week (decreasing to $168 when the older child turned eighteen), provide health insurance for the children, and cover 90% of any uninsured health care needs; (2) pay spousal support in the amount of $15,000 per year for two years, and then $16,500 per year for the next three years; and (3) maintain life insurance through his employment with Cheryl as the named beneficiary until both children reach the age of twenty-one years and, if life insurance is no longer available through David's job, to obtain it in an amount sufficient to cover his outstanding child and spousal support obligations. In 2001, the parties' son reached majority, and their then thirteen year old daughter continued to reside with Cheryl.

[¶ 3] In late January 2000, David filed a motion to modify the divorce judgment seeking to reduce his child support obligation and eliminate his obligations for spousal support and life and medical insurance. The motion was premised on David's anticipated loss of his job as an

assistant plant manager at the Carleton Woolen Mills, which was winding down its operations and was expected to close in April. Cheryl filed a motion for contempt in February because David was only paying a portion of the child support and none of the spousal support. Both motions were considered at a hearing that commenced on December 20, 2000, and concluded on May 8, 2001.

[¶ 4] From January to April 2000, David earned a total of $8000 from part-time employment at Carleton Woolen Mills. Upon the mill's closing in April, he began to receive unemployment benefits in the amount of $274 per week. The Department of Human Services garnished $127 per week for child support. His total income for the year 2000 was $18,000. David was living with his fiancée in her house in Winthrop at the time of the hearing. Before he lost his job, David had paid $548 per month to his fiancée as his share of her mortgage loan payment.

[¶ 5] As a "displaced textile worker," David was eligible to participate in "T.R.A.," a federally funded trade adjustment program, which afforded him eighteen additional months of unemployment benefits conditioned upon his participation in an approved training program. David enrolled in T.R.A. and entered a retraining program to become an airplane pilot, basing his career choice on his interest in aviation and his belief that the textile industry is in decline.[1] David decided not to seek a management position in other manufacturing sectors in Maine.

[¶ 6] David's unemployment benefits totaled approximately $14,248 a year. Upon being certified as a flight instructor after a year of additional training, David expected to earn $16,000 per year. He estimated he would have to work eighteen months as a flight instructor to accumulate the flight hours required to obtain the licensure necessary to obtain employment as a private pilot.

[¶ 7] The court found that David failed to pursue a meaningful employment search. His efforts consisted of contacting "a few people in the [textile] industry," and he made no effort to look for management positions outside of the textile industry because he believed the skills he had learned at the mill were "job-specific" and he would have to "start at entry level and work [his] way up."[2] David testified that he spends his days studying, cutting and "clearing wood, landscaping, ... and taking care of everything [around the home]" when he is not participating in pilot training. He offered no sound explanation for his failure to pursue full-time employment even though the minimum time he was required to dedicate to his pilot training program was nine hours per week. In

---

1. David's employment counselor at the Augusta Career Center testified that: the trade adjustment program entitles individuals to retraining if they do not have a marketable skill or cannot easily obtain employment earning at least 80% of what they were earning; when David came in, there were no comparable jobs listed, "so he could not easily jump back into the job market" earning at least 80% of his previous salary; David could have gone to work for another employer and still retained eligibility for the retraining program had he been laid off again as long as his income did not exceed 80% of his former income at Carleton Woolen Mills; and the training center did not examine job opportunities for David that would pay less than 80% of his previous salary. The counselor also testified that a requirement of the program is for David to put in a minimum of nine hours of training a week.

2. David's employment counselor testified that there were employment opportunities in Maine for which David might be eligible, including employment with the State Police, the Warden Service, the Department of Corrections, and MBNA, but she did not know the salaries associated with the positions.

addition, in the year following the loss of his job, David liquidated his retirement fund and used the proceeds to pay off all of his debts, including the $7800 owed on his car loan, and his fiancée's student loan. He also received a $3000 tax refund that he chose not to apply toward his support obligations. The court found that "[f]ollowing a job loss which was beyond his control, [David] obtained coverage for his own living expenses and has chosen to train a few hours per week for employment which will not predictably yield more than $16,000 yearly."

[¶ 8] Cheryl, who lives in Readfield in the former marital residence, testified that she was forced to spend her savings and most of the retirement money she received in the divorce judgment to pay her bills when David stopped paying the full amount of child support and all of the spousal support. In 2000 Cheryl had earned $11,230 cleaning residential and commercial buildings and working as a cook on weekends. She projected her income for the year 2001 to be $15,000. Cheryl testified that David owed her $22,551 for overdue spousal and child support.

[¶ 9] The court made detailed findings of fact in its order dated May 15, 2001. It found that "[a]fter his plant closed, [David] was approached about similar positions at plants in Minnesota, Georgia, North Carolina, and Mexico which would probably pay $40,000 to $50,000 to start. He did not investigate these jobs, testifying that he prefers to remain in Maine to be near his children." The court imputed income to David in the amount of $50,000 per year. Based upon this finding and its finding that Cheryl's income would be $15,000 per year beginning January 1, 2001, the court granted David's motion to modify the child support by ordering a retroactive reduction in his weekly child support obligation from $162.75 per week to $134 per week from January 20, 2000 to December 31, 2000, and $128 per week from January 1, 2001, forward, but did not modify his life and health insurance obligations. The court denied David's motion to eliminate spousal support, finding that the "[d]efendant may not escape court-ordered obligations by voluntarily earning substantially less than he is able . . . [a]nd under the circumstances, alimony as originally ordered is still appropriate."

[¶ 10] The court also granted Cheryl's motion for contempt and sentenced David to forty-five days in jail, suspended, subject to David purging himself of contempt "by paying $1375 in alimony each month beginning June 1, 2001, for three years as ordered in the Divorce Judgment, and child support each week, beginning June 1, 2001, as ordered in the attached Child Support Order." The court found David in contempt because "[h]is work and spending decisions demonstrate that [he] mistakenly failed to identify his responsibility for child support and alimony as more important than his personal preferences." The court also found that David "has the present ability to pay child support at the imputed level of $50,000 yearly, and alimony as ordered in the Divorce Judgment, as well as installments on the arrearage."

[¶ 11] The court then directed Cheryl's counsel to calculate David's child support and spousal support arrearage based upon its findings and retroactive modification of the child support award, and indicated that, upon its receipt of this information from counsel, it would enter an order establishing the arrearage and a schedule for repayment. The court ordered David to pay Cheryl $3500 in attorney fees based on the finding that the fees were reasonable, that David lived "rent-free" and studied "part-time," and that he had the greater ability to earn money to pay the fees. David filed this timely appeal.

## II. DISCUSSION

[¶ 12] David contends that the court committed clear error in its factual findings. He asserts that because the termination of his employment from Carleton Woolen Mills was involuntary and his decision to pursue a training program to become a commercial pilot instead of seeking employment was made in good faith, he is not voluntarily unemployed, and the court should not have imputed income to him apart from his unemployment benefits in the amount of $14,248 per year. He also asserts that the court erred in relying on evidence of distant job opportunities as the basis for imputing an earning capacity of $50,000 per year to him.

[¶ 13] The factual findings that form the basis for the trial court's decision regarding motions for contempt and modification are reviewed for clear error. *State v. Richard*, 1997 ME 144, ¶ 10, 697 A.2d 410, 414; *Cloutier v. Lear*, 1997 ME 35, ¶ 4, 691 A.2d 660, 662. "A court's finding is clearly erroneous only if there is no competent evidence in the record to support it." *Richard*, 1997 ME 144, ¶ 10, 697 A.2d at 414 (citing *Zink v. Zink*, 687 A.2d 229, 232 (Me.1996)). When there is no clear error in the factual findings, "we review a judgment of civil contempt for abuse of discretion." *Zink*, 687 A.2d at 232. Similarly "[w]e review a trial court's refusal to modify spousal support for abuse of discretion." *Largay v. Largay*, 2000 ME 108, ¶ 11, 752 A.2d 194, 197. A party wishing to modify spousal support must demonstrate that the desired modification is justified by a substantial change in circumstances. *Id.*

### A. Voluntary Unemployment or Underemployment

[¶ 14] The relationship between a court ordered duty of support and an individual's good faith decision to change careers and pursue additional education or retraining was previously considered in *Harvey v. Robinson*, 665 A.2d 215 (Me. 1995). In *Harvey*, the father, facing the possibility of involuntary retirement, decided to retire voluntarily and pursue a long held dream of attending college and medical school. *Id.* at 216. As a result of this decision, his annual gross income was reduced from $35,500 to $13,840, the amount he was able to earn from part-time employment and an educational grant while attending school. *Id.* The father sought modification of his child support obligation, and the trial court granted a reduction in the level of support based upon the father's new income of $13,840. *Id.* at 216–17. As justification for this finding, the trial court found that the father's decision to quit full-time employment to pursue college was made in good faith. *Id.* at 217. The trial court failed, however, to "explain how this accommodation to [the father's] preferences serve[d] the interests of the children in any way." *Id.* at 218.

[¶ 15] We held that a parent's good faith decision to voluntarily give up full-time employment to pursue education must be balanced with an evaluation of the long term effect that decision has on the interests of the children for whom the parent had an established duty of support. *Id.* Accordingly, we vacated the court's decision and "remanded for reconsideration of the child support determination based on [the father's] current earning capacity as a full-time employee." *Id.* at 219; *see also Dep't of Human Servs. ex rel. Monty v. Monty*, 2000 ME 96, ¶ 12, 750 A.2d 1276, 1280 (holding that a parent's decision to attend law school rather than work full-time supported an upward deviation in the level of child support); *Rich v. Narofsky*, 624 A.2d 937, 939 (Me. 1993) (holding that trial court erred in calculating support obligation based on a

parent's present income rather than on her earning capacity where the parent became unemployed in order to attend college).

[¶ 16] Here, David's loss of employment from Carleton Woolen Mills was involuntary, but his extended unemployment was not. David failed to conduct a meaningful employment search before deciding to dedicate himself exclusively to pilot training. He testified that he contacted "a few people in the [textile] industry" and that he made little or no effort to look for management positions outside of the textile industry.

■ [¶ 17] The trial court's conclusion that David's "work and spending decisions demonstrate that he mistakenly failed to identify his responsibility for child support and alimony as more important than his personal preferences" is inescapable. As addressed in *Harvey,* an individual's personal preference to pursue education or vocational training cannot, standing alone, justify a reduction in a preexisting support obligation. 665 A.2d at 218. David failed to meet his burden of establishing that his career decisions following the loss of his job from Carleton Woolen Mills served the interests of his children and his former spouse for whom he owed established duties of support. Indeed, David's career decisions appeared to serve only his self-interest. The court, therefore, did not err in concluding that David was voluntarily unemployed and that his ability to pay child and spousal support should not be premised on the amount of his unemployment benefits.

### B. Imputation of Income

■ [¶ 18] Having determined that a payor of support is voluntarily unemployed or underemployed, a court must next determine the appropriate amount of income to impute. Maine's child support and spousal support statutes recognize the propriety of determining an individual's ability to pay support based upon an evaluation of her or his "earning capacity" or "income potential." *See* 19-A M.R.S.A. § 2001(5)(D) (1998) ("Gross income [for purposes of determining child support] may include the difference between the amount a party is earning and that party's earning capacity when the party voluntarily becomes or remains unemployed or underemployed, if sufficient evidence is introduced concerning a party's current earning capacity."); 19-A M.R.S.A. § 951-A(5)(B), (D), (E) (Supp.2002) ("The court shall consider, [among other things,] the following factors when determining an award of spousal support; ... [t]he ability of each party to pay; ... [t]he employment history and employment potential of each party; ... [and t]he income history and income potential of each party ....").  A person's earning or income potential is a product of a variety of factors, including that person's qualifications, income history, and the earning or income opportunities that are reasonably available to that person.

[¶ 19] The court imputed an earning capacity of $50,000 to David. In its findings the court expressly cited evidence of employment positions available in Minnesota, Georgia, North Carolina, and Mexico, similar to David's previous position at Carleton Woolen Mills. These positions offered salaries in the range of $40,000 to $50,000 per year.

[¶ 20] We have not previously considered the extent to which the determination of an individual's earning potential may be based on evidence of employment opportunities that will require the individual to relocate a great distance. This determination requires a careful balancing of all relevant factors because, as here, it has a direct effect on the financial resources of two households and it has the potential to substantially disrupt the relationship between a parent and his children. People,

whether in intact, divorced, or blended families, often forego distant employment opportunities based on their own needs and the needs of their children, spouses, and other family members. A court considering distant employment opportunities in connection with an imputed income determination should be mindful of the legitimate nonfinancial factors that may counsel against an individual's acceptance of such employment.

[¶ 21] We conclude that the court erred by relying on evidence of distant employment opportunities in determining David's earning potential without also considering the nonfinancial consequences that would result if he accepted such employment. David has never worked outside of Maine. A court order that would have the effect of compelling him to move from Maine to Minnesota or one of the other distant locations is incongruent with his work and life experience to date. Under these circumstances, the court should consider the effect such a move would have on David's long-established familial and social relationships, and, most importantly, his relationship with his children. When considering evidence of distant employment opportunities as part of the determination of an individual's earning capacity, the evidence should be analyzed not only from the perspective of the financial benefits associated with the opportunities, but also from the perspective of the nonfinancial hardships that will result.[3]

[¶ 22] The record evidence reflects that a move by David to accept one of the distant job opportunities would substantially disrupt his relationship with his children. Such a move would also substantially disrupt David's social and community ties because he has worked and resided continuously in Maine for the past twenty-five years. In addition, the court did not find that there are no job opportunities for David in Maine that are commensurate with his experience, qualifications and earning history. Under these circumstances, it was error for the court to base its finding regarding David's earning potential on evidence of the salaries associated with distant job opportunities.

[¶ 23] Accordingly, we vacate the court's modification and contempt order and remand for its reconsideration of all economic issues. We, therefore, do not address David's arguments concerning attorney fees, his life and health insurance obligations, and whether his gross income should be reduced by the amount of his spousal support obligation when the court determines child support. In view of the passage of time, the court should receive additional evidence regarding the parties' current financial circumstances.[4]

---

3. *See Reece v. Reece,* 22 Va.App. 368, 470 S.E.2d 148 (1996), in which the court articulated the following eight factors for consideration:

   (1) the supporting spouse's business ties to the community; (2) the supporting spouse's familial ties to the community; (3) whether the supporting spouse's relocation would have an undue deleterious effect upon his or her relationship with his or her children or other family members; (4) the length of time in which the supporting spouse has resided in the community; (5) monetary considerations which would impose an undue hardship upon the supporting spouse if he or she were forced to relocate; (6) the "quality of life" in the respective communities; (7) the geographic distance between the respective communities; and (8) the severity of the burden which a failure to relocate would have on the obligee spouse. *Id.* at 152–53.

4. In arriving at David's earning capacity, the court is not limited to the evidence offered by the parties, but may also consider Department of Labor statistics, 19–A M.R.S.A. § 2004(1)(E) (1998), and take judicial notice of relevant information "generally known within the territorial jurisdiction of the trial court." M.R. Evid. 201(b).

### C. Requirements of Contempt Order

[¶ 24] Because we vacate the court's modification and contempt order, we do not reach several of David's arguments regarding the modification and contempt relief ordered by the court. We do, however, address one aspect of the court's contempt order because of the likelihood that the court will revisit the issue on remand if David is again found in contempt.

[¶ 25] David asserts that the court erred in concluding that he had a present ability to purge himself of contempt. The court sentenced David to forty-five days in jail, suspended, subject to David purging himself of contempt "by paying $1375 in alimony each month beginning June 1, 2001, for three years as ordered in the Divorce Judgment, and child support each week, beginning June 1, 2001, as ordered in the attached Child Support Order."[5] David, therefore, had seventeen days from the date of the contempt order to avoid incarceration by paying $1375 in spousal support and $128 in child support.

▬▬ [¶ 26] "An essential element of civil contempt is the defendant's ability to comply with the court's order." *Zink*, 687 A.2d at 232 (quoting *Mitchell v. Flynn*, 478 A.2d 1133, 1135 (Me.1984)). It must be demonstrated by clear and convincing evidence that "it is within the alleged contemnor's power to perform the act required or cease performance of the act prohibited." M.R. Civ. P. 66(d)(2)(D)(ii).

[¶ 27] A separate question arises with respect to the remedial sanction ordered by the court as a result of its contempt finding. The imposition of coercive imprisonment as a remedy for contempt is expressly authorized by M.R. Civ. P.

66(d)(3)(A) ("A person adjudged to be in contempt may be committed to the county jail until such person performs the affirmative act required by the court's order."). We have figuratively described the requirement that contemnors "carry the keys of their prison in their own pockets" as an essential predicate for the imposition of incarceration as a coercive remedy for civil contempt. *Land Use Regulation Comm'n v. Tuck*, 490 A.2d 649, 652 (Me. 1985) (quoting *Wells v. State*, 474 A.2d 846, 850 (Me.1984)) (internal quotation marks omitted).

[¶ 28] Accordingly, a court may order the immediate incarceration of the contemnor pursuant to Rule 66(d)(3)(A), if it finds that the contemnor has the ability to immediately perform the act or acts required to earn release from prison. If the court orders incarceration, but postpones the onset of the incarceration to a future date to afford the contemnor an opportunity to perform and avoid incarceration, the contemnor must be found to have the ability to perform the acts required no later than the date established for the onset of incarceration. When a finding of contempt is based upon an imputation of income and it is expected that the contemnor will have to find new employment to generate the income needed to purge the contempt, the period of postponement established by the court should reflect the time reasonably required for this to be achieved. Measured by the standard of an ability to immediately perform, the seventeen-day period provided by the court's order for David to resume the payment of spousal support and child support by paying a total of $1503, or face forty-five days of incarceration, was not reasonable.

---

**5.** The order was dated May 15, 2001. The docket sheet reflects that the order was entered on June 4, 2001. Because judgments are not effective until they have been entered by the clerk on the docket, M.R. Civ. P. 58, it is frequently advisable in a contempt order to establish the period for performance to run from the date of the entry of the order.

[¶ 29] In addition, David cannot be deemed to have the ability to immediately perform his child support and spousal support obligations when those obligations are concurrent with an additional, but undetermined, obligation to pay support arrearages. The order provided that the court would impose an additional payment obligation on David once the amount of the arrearage was established. David's ability to pay the ongoing child support and spousal support and, therefore, avoid incarceration, would necessarily be affected by the separate relief the court eventually ordered with respect to the arrearages. Therefore, his separate obligation to pay a support arrearage should be established by the court before it determines the period within which he must perform the acts necessary to avoid incarceration.

[¶ 30] We find without merit, and do not separately address, David's remaining assertions.

The entry is:

Judgment vacated. Remanded to the District Court for proceedings consistent with this opinion.