

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 35749-0-III |
| KIMBERLEY A. COLLINS, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| JAMES R. WALLACE, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — James Wallace, who represented himself at the trial of this proceeding to dissolve his and Kimberly Collins's marriage, assigns error to issues that for the most part were not raised during the bench trial, or with respect to which his own evidence was insufficient.

The issues and arguments on appeal suggest that Mr. Wallace might have obtained more favorable dissolution terms had he better understood the importance of marshalling evidence and making his case during the two days devoted to the dissolution trial. Given the evidence presented and arguments made during trial, the trial court did not err or abuse its discretion on any issue except one: the imputation of Mr. Wallace's income, which raised an issue of first impression. We reverse the decision on Mr. Wallace's child support payments and remand for further findings on the imputation of income issue, but otherwise affirm.

### FACTS AND PROCEDURAL BACKGROUND

Kimberly Collins filed a petition for the dissolution of her then 10-year marriage to James Wallace in August 2016. Both parties operated businesses during the marriage. Ms. Collins worked as a software consultant for health insurance companies. Mr. Wallace operated an auto mechanic business, coupled in the early years of their marriage with a rental car business. It is undisputed that Ms. Collins was the primary breadwinner for the family during the marriage.

A point of contention for many years of the marriage was Mr. Wallace's failure to file tax returns and pay taxes. Ms. Collins and Mr. Wallace jointly filed their taxes for the first year of their marriage, with Ms. Collins's accountant helping Mr. Wallace get

caught up on some prior years' returns. After that first year, Ms. Collins began filing her taxes separately. As of the time of trial, Mr. Wallace had not filed federal income tax returns for tax years 2008 through 2016.

During the marriage, the couple first lived in the Seattle/Tacoma area. In 2011, they acquired a home in Cle Elum that they initially used on weekends. Over time, they remodeled the inside of the home, added a large garage with a second story apartment, and added a barn. In 2014, the couple sold the home in Federal Way that had been their primary residence. When their planned purchase of a home in Gig Harbor failed to close, they began living full-time in the Cle Elum home.

At the time of the dissolution trial, the parties owned three residential properties: the Cle Elum home and two rental properties in Tacoma. Ms. Collins had persuaded Mr. Wallace to quitclaim his interest in the Cle Elum home to her in connection with a refinancing in August 2014. Given Mr. Wallace's "looming IRS[1] issues" she took the position that it was "a risk to my family to have him continue to be on the deed." Report of Proceedings (RP) at 67.

Another asset owned at the time of the dissolution trial was a cannabis retail license application for the city of SeaTac that Mr. Wallace applied for in the name of his

---

[1] Internal Revenue Service.

3

limited liability company and that became eligible to move forward when Mr. Wallace won a lottery in 2013. Mr. Wallace never acted on the license application, because from the time he won the lottery, the city of SeaTac prohibited any land use that violated federal law.

In her petition for dissolution filed in August 2016, Ms. Collins took the position that spousal maintenance should not be ordered. In his response to the petition filed in April 2017—at a time when he was represented by counsel—Mr. Wallace agreed.

The dissolution trial was set for September 26, 2017. A month before trial, Mr. Wallace's lawyer filed notice of his intent to withdraw on September 7. He withdrew without objection and Mr. Wallace proceeded pro se.

Trial

Trial began as scheduled on September 26. As a first order of business, Ms. Collins's lawyer informed the court that the trial brief received from Mr. Wallace the day before sought a spousal maintenance award for Mr. Wallace, contrary to the position he had taken five months earlier in answering the petition. Claiming surprise, Ms. Collins objected to the court's consideration of the request. Mr. Wallace responded that he had "defective counsel" at the time he answered. RP at 24. He also argued that his and Ms. Collins's financial information was all before the court in connection with other issues, consideration of spousal maintenance should not come as a surprise, and "it doesn't seem like there's anything that should require any additional time." RP at 31.

4

The trial court ruled that "at this point . . . maintenance is not an issue." RP at 42. But it stated that it would hear the evidence on the issues that remained in the case "[a]nd then I'm going to let you raise that issue one more time at the end of the trial . . . because I don't know what the evidence is going to be." *Id.*

Three witnesses testified on behalf of Ms. Collins: herself, Adam Robertson, and Thomas Gordon.

On issues relevant to the appeal, Ms. Collins testified to her own and Mr. Wallace's income or earning capacity. She described the terms of the contract under which she was then working for a New York company and identified $14,000 as the amount she expected to gross monthly.

As for Mr. Wallace's income, she testified that he had never earned as much from self-employment as he could have as an employee. She identified exhibit P12, a compilation of job postings for "high end" automotive service advisor jobs for which she believed he was qualified. RP at 110. A job listed in Burien paid $5,500-$9,000 per month, and the remaining jobs, located in Kirkland, Puget Sound, and Monroe, had average salaries ranging from $60,000 to $90,000.

She testified that after she and Mr. Wallace separated, they discussed a division of assets, and Mr. Wallace refused to recognize any value to his cannabis retail license

5

application, characterizing it as a "worthless piece of paper." RP at 83. Believing it might have value, she located a broker, Thomas Gordon, who obtained an offer for the license application and would testify to its value at the trial.

Finally, she testified to the circumstances under which Mr. Wallace had quitclaimed his interest in the Cle Elum home, which she considered to be her separate property.

Mr. Robertson, an automotive repair and technology instructor who had been Mr. Wallace's business partner for about eight years, testified to Mr. Wallace's earning capacity. He characterized Mr. Wallace's abilities as a repair technician as "[d]efinitely above average" and testified that given his advanced certifications, Mr. Wallace would have no problem getting a job. RP at 139. He reviewed exhibit P12, comprising the four job postings Ms. Collins had identified from the greater Seattle area, and testified that Mr. Wallace was qualified for all of them.

Thomas Gordon, a real estate and business opportunity broker, testified that after being contacted by Ms. Collins, he had obtained a third party's offer to purchase Mr. Wallace's cannabis retail license application, which he forwarded to Mr. Wallace in July 2017. The offer called for Mr. Wallace to receive the following amounts:

- $100,000 when the buyer was added to the license application and all parties had completed their identity history summary check,
- A further $100,000 upon licensing,

- A further $200,000 after licensing, payable in $10,000 monthly installments, and

- A further $300,000 upon the earlier of the retail store opening for business or any license transfer.

Ex. P13. Mr. Gordon testified that the offeror was the experienced owner of a retail license who was then operating in the city of Seattle. He stated that the offeror had the wherewithal to stand behind the offer. He agreed with Ms. Collins's counsel's characterization of the offer as having a "prospective value" of $700,000. RP at 185.

In cross-examining Mr. Gordon, Mr. Wallace's questioning included the following:

> Q. Well, according to the City of SeaTac, they—they passed a moratorium back in 2014 and they weren't going to allow any stores to open and I was just wondering if you were aware of that.
>
> [MS. COLLINS'S COUNSEL]: I'll object to the question stating facts not in evidence.
>
> THE COURT: Sustained.

RP at 191-92. Mr. Wallace then attempted to question Mr. Gordon about moratoria or bans on marijuana sales in Washington cities other than SeaTac. His questions drew objections to relevance that were sustained. His efforts to question Mr. Gordon about what would happen if the voters of SeaTac or the voters of some other city voted to ban marijuana drew objections that he was calling for speculation; those objections were also sustained.

7

Mr. Wallace questioned Mr. Gordon about whether the license was only good in a certain geographical area, to which Mr. Gordon responded, "The license—can travel. A 502 license can travel to—a [sic] area that—whose licenses are not sold out, where . . . there's openings." RP at 200. Asked by Mr. Wallace if there were any such areas in the state, Mr. Gordon answered that there were.

When it was Mr. Wallace's turn to present his case, he served as his only witness. Responding to Ms. Collins's evidence of his earning capacity, he accused Mr. Robertson of bias, stating that he and Mr. Robertson had ended their business dealings on bad terms. He characterized the four job postings compiled as exhibit P12 as "pie in the sky" possibilities. RP at 306. He also told the court that his goal was to stay in Cle Elum, close to his children, and to continue to be self-employed. He told the court that when the family moved to Cle Elum, "we wanted to get away from what was going on on the west side as far as, you know, socially and all the traffic and all the problems that they have over there" and "once we moved up here, everybody loves it." RP at 306.

Addressing the Cle Elum home, Mr. Wallace testified that he could trace a separate property interest in the home, which should be recognized. He explained that the proceeds of the sale of a home that was his separate property were used as a down payment on the parties' Federal Way home; the sale of the Federal Way home netted

$63,000; and that $63,000 was later used to finish the garage and apartment at the Cle Elum property. When asked by the trial court why the later quitclaim deed to Ms. Collins was not controlling, Mr. Wallace argued that it was invalid.

Questioned by the trial court about the cannabis retail license application, Mr. Wallace acknowledged that he had paid $600.00 to apply for the license and that the application process was extensive. Asked whether, if the license application was worthless, the trial court should award it to Ms. Collins, Mr. Wallace answered, no, because it "potentially" had value. RP at 275. He discounted almost completely the offer secured by Mr. Gordon, telling the court that the offer had been revised—moving up the closing date, but adding additional contingencies to all but an initial $50,000.00 payment. Mr. Wallace told the court that at most he thought the license application was worth "$50,000.00[,] if they write the check." RP at 276.

At the conclusion of the evidence, the court gave Mr. Wallace the opportunity to address the issue of spousal maintenance again. It then announced its preliminary thoughts on the issues, explaining that it was letting the parties know "where I'm heading with this; but—but you might be able to convince me I'm completely wrong and that's fine. I want you to be able to focus on what I'm thinking." RP at 366. After announcing its preliminary thoughts, it heard closing arguments.

Following closing arguments, the trial court announced the matters on which it had made final decisions and those that it intended to consider further. It stated it would reconvene the parties to deliver a final decision on the remaining issues.

In an order filed about a week later, the trial court directed the parties to appear for a hearing on October 23, 2017, "to answer additional questions and obtain a ruling." Clerk's Papers (CP) at 437. A few days later, and before the hearing could take place, Mr. Wallace filed what he styled as a CR 60 motion to vacate the valuation of the cannabis retail license application, which the trial court had announced it would value at $500,000. Mr. Wallace characterized Mr. Gordon as having misled the court by failing to disclose that a SeaTac ordinance and Liquor and Cannabis Board regulations rendered his license application worthless. He supported the motion with a copy of SeaTac Ordinance 13-1001, which forbids land use within the city that is prohibited by federal law, and an electronic mail exchange with a Liquor and Cannabis Board investigator informing Mr. Wallace that his license application was not transferrable to another jurisdiction.

The trial court entertained Mr. Wallace's motion at the October 23rd hearing, treating it as a motion for reconsideration. The court stated that it was denying the motion, but in substance it refused to consider it, explaining to Mr. Wallace,

> [Y]ou've had a fair opportunity to develop your case, to find out what the other side's witnesses were going to say and to prepare to offer contrary evidence and you didn't do that.
>      So, I have to go by the evidence that I have. So, the motion is denied.

10

RP at 416.

On November 20, 2017, the trial court entered its findings and conclusions, the final divorce decree, and the order for child support. On matters that are the subject matter of appeal, the trial court found (1) the marijuana retail license application, which it awarded to Mr. Wallace, had a value of $500,000, (2) spousal support was requested by Mr. Wallace but would not be ordered, (3) the Cle Elum home was Ms. Collins's separate property and would be awarded to her, and (4) for child support calculation purposes, Ms. Collins's actual monthly net income was $9,442 and Mr. Wallace was voluntarily unemployed, with imputed monthly income of $5,000.

Mr. Wallace appeals.

ANALYSIS

Trial court decisions in a dissolution action will seldom be changed upon appeal—the spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court. *In re Marriage of Bowen*, 168 Wn. App. 581, 586, 279 P.3d 885 (2012) (citing *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985)).

Mr. Wallace makes four assignments of error to the trial court's property distribution and support decisions: he assigns error to the trial court's valuation of the SeaTac cannabis license application, its refusal to address the issue of spousal

maintenance, its findings that his deed quitclaiming the Cle Elum home is valid and the

home was Ms. Collins's separate property, and its findings as to his and Ms. Collins's

imputed and actual monthly income. We address the assigned errors in the order

presented.

I.    THE $500,000 VALUE FOR THE RETAIL MARIJUANA LICENSE FALLS WITHIN THE
      RANGE OF CREDIBLE EVIDENCE

The nature of our review of a trial court's valuation of property in a divorce case is

well settled. If the valuation falls within the range of credible evidence, it will not be

disturbed. *Worthington v. Worthington*, 73 Wn.2d 759, 765, 440 P.2d 478 (1968). When

an expert testifies, the factfinder is given wide latitude in the weight to give his or her

opinion. *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993) (citing

*Taylor v. Balch Land Dev. Corp.*, 6 Wn. App. 626, 632, 495 P.2d 1047 (1972)). If the

standard is satisfied, we will not substitute our judgment for that of the trial court even

though we might have resolved a factual dispute differently. *Sunnyside Valley Irrig. Dist.*

*v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

It was represented by Ms. Collins and her lawyer that she identified Mr. Gordon in

response to interrogatories several months before trial. Mr. Gordon testified to his

experience brokering dozens of similar transactions and testified that the maker of the

offer to Mr. Wallace was viable and "would complete the deal." RP at 188. In arriving

at a value, the offer was clearly relevant evidence, although it needed to be discounted

from the $700,000 potentially payable for the $50,000 commission due Mr. Gordon, time

value, and the contingencies. A $500,000 value reflects a material discount from the

$700,000 potentially payable and falls within the range of the evidence.

Mr. Wallace argues, however, that it is legal error when a trial court ignores

controlling law, and SeaTac Ordinance 13-1001 was controlling law. At the time of trial,

however, Mr. Wallace did not properly call the SeaTac ordinance to the court's attention.

He did not plead it in accordance with CR 9(i), nor did he present it as evidence in

accordance with RCW 5.44.080.

It is not enough to merely allude to the existence of an ordinance. In *State v.*

*Martin*, 14 Wn. App. 717, 719, 544 P.2d 750 (1976), for instance, defense counsel

referred to a Hoquiam ordinance that made delivery of marijuana unlawful but made no

further effort to place the ordinance before the court as evidence or by pleading. This

court held that "[u]nless an ordinance of a city or town is properly called to a superior

court's attention, neither that court nor an appellate court will take judicial notice of the

ordinance or of its content." *Id.*

*Town of Forks v. Fletcher*, 33 Wn. App. 104, 105, 652 P.2d 16 (1982), on which

Mr. Wallace relies, is inapposite. That case applied the rule that a *municipal court* is

required to take judicial notice of ordinances of the municipality in which it sits, whether

or not the ordinance is properly pleaded. It extended the application of that rule to district courts determining violations of ordinances of a city that does not have its own municipal court. *Forks* would only apply if the violation of a SeaTac ordinance was being tried in a King County district court or appealed to a King County superior court. It has no application to this case.

The trial court even explained to Mr. Wallace on the first day of trial that he could not testify to the content of an ordinance but "[t]here would be a way through producing copies of official City documents that you could show what they did. . . . But you can't just testify about it." RP at 247. Despite the explanation, Mr. Wallace did not offer a copy of the ordinance as evidence on the second day of trial.

While Mr. Wallace supported his request for reconsideration with a copy of Ordinance 13-1001 and electronic mail with a Liquor and Cannabis Board investigator, the court was not required to consider the new evidence. CR 59 provides that on the motion of an aggrieved party the court "may" vacate an interlocutory order and grant reconsideration. The trial court's discretion extends to refusing to consider an argument raised for the first time on reconsideration absent a good excuse. *River House Dev. Inc. v. Integrus Architecture, PS*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012) (citing *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 811 (9th Cir. 1995) (applying parallel federal rule), *cert. dismissed*, 516 U.S. 1103, 116 S. Ct. 833, 133 L. Ed. 2d 832 (1996)).

We review a trial court's denial of a motion for reconsideration for abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Id.* (citing *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 684-85, 41 P.3d 1175 (2002)).

The trial court did not abuse its discretion by refusing to consider Mr. Wallace's new evidence. Pro se litigants are held to the same standards as attorneys and are bound by the same rules of procedure and substantive law. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). Mr. Wallace had no good excuse for being unprepared at trial to challenge or respond to Mr. Gordon's testimony.[2]

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. WALLACE'S REQUEST FOR SPOUSAL MAINTENANCE

Mr. Wallace contends that the trial court erred by refusing to address the issue of spousal maintenance. In fact, the court vacillated on whether to entertain Mr. Wallace's request for maintenance. It ultimately did entertain the request, and denied it.

When the trial court invited Mr. Wallace at the close of the evidence to identify the basis for his request for maintenance, Mr. Wallace stated that he relied on evidence of

---

[2] The new evidence offered also did not prove, as Mr. Wallace contends it did, that his license application was worthless. The e-mail was hearsay and inadmissible. The ordinance was current law but, as the trial court observed, it left unanswered the potential that local law would change. In making his offer in July 2017, the offeror identified by Mr. Gordon apparently believed that local law could change or that the license application might be transferred to a different jurisdiction.

the disparity between Ms. Collins's financial situation and his own, and the quality of life

he had enjoyed during the marriage. In laying out its "preliminary thoughts," the trial

court stated, "[M]y decision remains that maintenance is not an issue." RP at 355. After

hearing the closing arguments, however, the trial court expanded on the maintenance

issue, stating,

> There are statutory factors to consider. If you consider the factors I
> seriously doubt there would be maintenance in this case anyway because
> you've got age and health of the parties. They're both still relatively
> young[3] and—and healthy. There is an issue about standard of living,
> although when people get divorced typically both of their standards of
> living are reduced.
> There's an issue about length of marriage. This is a relatively short
> marriage, ten years, typically there's not a whole lot of maintenance giv[en]
> in a marriage of only ten years. Um . . . it comes down, really, to the
> relative financial condition of the parties and their ability to pay their own
> expenses and in this case, I am finding that Mr. Wallace is—is under
> employed essentially.

RP at 395-96 (alterations in original).

The court's written findings, conclusions, and decree are the final word on the

subject. *In re Marriage of Raskob*, 183 Wn. App. 503, 512, 334 P.3d 30 (2014) (when

there is an inconsistency between the court's oral ruling and its written findings and

conclusions, the written findings and conclusions control). The findings recognize that

"[s]pousal support was requested by [Mr. Wallace]." CP at 630. They then deny the

request, stating,

---

[3] Mr. Wallace was 44 at the time of trial; Ms. Collins was 42.

16

> Spousal support should not be ordered because:
> Respondent is well trained and capable automobile mechanic, can earn a good living if he chose to do so, shows earnings and based on his level of skill is imputed earning capacity of at least $60,000 per year and has an asset worth $500,000 being awarded to him, not including his auto repair business.

*Id*. at 630, *and see Id.* at 637.

Treating Mr. Wallace's assignment of error as a challenge to the trial court's refusal to award maintenance, we turn to RCW 26.09.090. It provides that a trial court "may" grant spousal maintenance "in such amounts and for such period of time as the court deems just, without regard to misconduct, after considering all relevant factors." RCW 26.09.090(1). The purpose of maintenance is to support a spouse until he or she is able to become self-supporting. *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). In determining whether to award maintenance, the trial court exercises broad discretionary powers and its disposition will not be overturned on appeal absent a showing of manifest abuse of discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984).

The trial court's oral ruling and written findings and conclusions reveal that it considered relevant factors. No manifest abuse of discretion is shown.

III.    THE TRIAL COURT DID NOT ERR IN TREATING MR. WALLACE'S QUITCLAIM OF THE CLE ELUM HOME AS VALID

When the Cle Elum home was acquired, which was during the parties' marriage, it was presumptively community property. *In re Marriage of Pearson-Maines*, 70 Wn.

App. 860, 865, 855 P.2d 1210 (1993). Title was initially in both parties' names. Mr.

Wallace argued in his trial brief and testified at trial that he was able to trace $63,000 in

his separate property to improvements to the Cle Elum home, however, and he claimed

entitlement to a separate property lien against the community asset. *See Farrow v.*

*Ostrom*, 16 Wn.2d 547, 556, 133 P.2d 974 (1943) (equity may impress a lien on

community property in favor of one who is clearly shown to have contributed separate

funds to its acquisition).

Ms. Collins responded that whatever the character of the Cle Elum home before

August 2014, it became her separate property when Mr. Wallace executed the quitclaim

deed. She testified that the reason she asked Mr. Wallace to execute the deed was that

she had spent hundreds of thousands of dollars[4] on improving the property "and with his

looming IRS issues and inability to file tax returns for six or seven plus years, I felt that it

was a risk to my family to have him continue to be on the deed. So he agreed to

quitclaim the property." RP at 67. She testified that Mr. Wallace had plenty of time to

think about it and agreed it was a good idea. She characterized Mr. Wallace as agreeing

---

[4] During her direct examination, Ms. Collins frequently referred to the many expenses she paid out of her earnings, from her bank account. In a colloquy, the trial court clarified that her lawyer understood that Ms. Collins's earnings during the marriage were community property and obtained the lawyer's agreement that who paid which expenses, out of which account, was not worth spending much time on.

The trial court stated that the quitclaim deed "raises a completely separate issue." RP at 174.

18

"that it was his mess and he didn't want to see something bad happen to the home where our children live." RP at 87.

During closing arguments, Mr. Wallace admitted, when questioned by the trial court, that the reasoning behind the quitclaim deed was that he had not filed tax returns and Ms. Collins wanted to protect the Cle Elum home. He argued, however, that "the deed itself is defective and I didn't have any legal counsel." RP at 371.

In its oral ruling, the trial court disagreed with Mr. Wallace's argument that the quitclaim deed was defective. It explained:

> I think it's pretty clear that it is a—intended as a Quitclaim Deed of his interest in the house to her as her separate property and there is clearly a good reason for that and that's been repeatedly shown by the evidence that Mr. Wallace doesn't file tax returns, he runs a business without—that's not licensed. He runs a business where he's not collecting sales tax. There is a very substantial risk of taxing authorities or other authorities coming in and trying to put liens on property and so on and that's—so, it certainly would be justifiable to put the house in the other spouse's name, given that risk.

RP at 397-98.

Mr. Wallace argues on appeal that the trial court should have found the deed null and void for the following reasons:

- The deed's recital that it is executed "to correct vesting" and "to separate community property" does not withstand examination and would not have justified a conveyance of the entire interest in the property,

- Since unsigned by Ms. Collins, the deed could not convey her community property interest, and

- The consideration clause inconsistently states "for and in consideration of zero ($0.00) dollars" and "in hand paid."

19

Opening Br. of Appellant at 33-35 (internal quotation marks omitted). These challenges

present issues of law that we review de novo. *Cf. Washington Prof'l Real Estate LLC v.*

*Young*, 190 Wn. App. 541, 550, 360 P.3d 59 (2015) (reviewing de novo the trial court's

construction of a contract).

We first note that Mr. Wallace cites no legal authority in support of his reasons for

contending that the quitclaim deed is null and void. "'Where no authorities are cited in

support of a proposition, the court is not required to search out authorities, but may

assume that counsel, after diligent search, has found none.'" *Frank Coluccio Const. Co.*

*v. King County*, 136 Wn. App. 751, 779, 150 P.3d 1147 (2007) (quoting *DeHeer v.*

*Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

The effect of quitclaim deeds is addressed by RCW 64.04.050. If prepared "in

substance" in the statutorily-prescribed form, a quitclaim deed that is otherwise duly

executed

> shall be deemed and held a good and sufficient conveyance, release and
> quitclaim to the grantee, his or her heirs and assigns in fee *of all the then
> existing legal and equitable rights of the grantor* in the premises therein
> described.

(Emphasis added.)

The quitclaim deed executed by Mr. Wallace, which Ms. Collins testified was

prepared by a bank, was "in substance" in the statutory form, as can be seen when

viewing the language side by side:

| Statutory form: | Wallace to Collins deed: |
|---|---|
| The grantor (here insert the name or names and place of residence), for and in consideration of (here insert consideration) conveys and quitclaims to (here insert grantee's name or names) all interest in the following described real estate (here insert description), situated in the county of . . . . . ., state of Washington.  Dated this . . . . day of . . . . . ., (year) . . . . | THE GRANTOR(S) James R. Wallace for and in consideration of zero ($0.00) dollars/to correct vesting/to separate community property in hand paid, conveys and quitclaims to Kimberly A. Collins, a married woman as her sole and separate property, the following described real estate, situated in the County of Kittitas, State of Washington together with all after acquired title of the grantor(s)] herein: [(description inserted)]. . . .  Dated August 6, 2014 |

RCW 64.04.050; Ex. P1.  This court has previously held that omission of the words "all interest in" from the statutory form is insubstantial, and does not prevent the deed from validly conveying all of the grantor's right, title, and interest.  *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 67-68, 277 P.3d 18 (2012).  The operative language, which is present in Mr. Wallace's quitclaim deed, is "conveys and quitclaims."  *Id.* at 67 (citing 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 14.2, at 116 (2d ed. 2004)).

Mr. Wallace's first and third arguments depend on what he characterizes as "inconsistencies" in the deed.  An argument that the language of the deed is inconsistent concedes an ambiguity, and ambiguity supports the consideration of extrinsic evidence.  *Id.* at 65 (citing *Sunnyside Valley*, 149 Wn.2d at 880).  In such a situation, we will consider the circumstances of the transaction and the subsequent conduct of the parties in

21

determining their intent at the time the deed was executed. *Id.* Where we remain in doubt as to the parties' intent, in general, a deed will be construed against the grantor— here, Mr. Wallace. *Id.* The use of extrinsic evidence arguably has special application to recitals of consideration in quitclaim deeds, since they require no consideration at all. *See Bale v. Allison*, 173 Wn. App. 435, 445-50, 294 P.3d 789 (2013).

Extrinsic evidence supported the trial court's implicit finding that there was no invalidating confusion about the purpose of the deed or the nature of any consideration passing in the transaction.

Mr. Wallace's second argument is based on a misunderstanding of community property. Ms. Collins did not have to sign the quitclaim deed and convey her community property interest. By statute, Mr. Wallace's conveyance of his community property interest to Ms. Collins "operate[d] to divest the real estate therein recited from any or every claim or demand as community property and . . . vest[ed] the same in the grantee as separate property." RCW 26.16.050.

The trial court did not err in characterizing the property as Ms. Collins's separate property.

IV.     WITH GUIDANCE ON THE IMPUTATION OF INCOME ISSUE, WE REMAND FOR
        RECONSIDERATION OF THE CHILD SUPPORT AWARD

Finally, Mr. Wallace assigns error to the trial court's findings, for child support calculation purposes, that Ms. Collins's monthly net income was $9,442 and that he was voluntarily unemployed and would be imputed monthly income of $5,000.

Both parties submitted financial declarations in support of their monthly income. Ms. Collins's declaration submitted shortly before trial identified her monthly income as $14,000. At trial, she explained that she was working under a contract in which her $120 hourly rate was guaranteed, but it was a billable-hour job and she did not know how many hours she would end up billing. She explained that she could not bill for travel time to and from New York. She based her projected monthly income on her past working history and what she deemed a safe estimate going forward. The trial court accepted her $14,000 per month estimate and arrived at its net income figure of $9,442 after deducting her tax (income and FICA) obligations and a voluntary monthly retirement contribution. Mr. Wallace argues that the starting figure should have been based on Ms. Collins's $120 an hour rate and an assumption that she would bill full-time hours.

Mr. Wallace's financial declaration submitted shortly before trial identified his monthly income as $2,250. It was supported by his 2016 federal income tax return, which had been prepared but not filed approximately a week before trial, and reported net business income of $27,725. He also submitted prepared but unfiled federal income tax

returns for the years 2011 through 2015, which had the following preparation dates and

showed the following business income:

| Tax year | Date prepared | Business income |
|----------|---------------|-----------------|
| 2011 | May 25, 2017 | $ 36,423.00 |
| 2012 | May 25, 2017 | $ 35,599.00 |
| 2013 | May 26, 2017 | $ 34,183.00 |
| 2014 | May 26, 2017 | $ 6,165.00 |
| 2015 | Sept. 11, 2017 | $ 13,562.00 |

Sealed CP at 352-383.

Ms. Collins testified that in addition to income that was recorded in Mr. Wallace's

books, he sometimes received cash for work that was never invoiced. She did not present

evidence as to the amount of his cash business, other than to testify that she "[knew] there

was cash in the safe . . . and he always has cash in his pocket." RP at 78-79. She

admitted that his bookkeeping records reflected a cash account that recorded some cash

coming into the business. She offered the view that "that was used judiciously for him to

put into the register" while at the same time admitting she "[didn't] know how that

worked." RP at 126.

Asked by the trial court about the extent of any unreported cash income, Mr.

Wallace admitted that he sometimes accepted cash or bartered with customers on small

jobs, but stated it would have been only a "handful of times where I helped out a

neighbor or something." RP at 260.

The trial court also had the $60,000 to $108,000 annual earning capacity figures for Mr. Wallace testified to by Mr. Robertson, based on the Seattle area job postings from exhibit P12. That became the primary evidence on which the trial court relied in imputing $5,000 a month in income to Mr. Wallace. In orally announcing its final decisions, the trial court stated:

> Mr. Wallace wants to run h[is] own business. All of the evidence indicates that he—he can't. Um . . . he's never really been able to—and I think he had one good year and all of his—all of his testimony is that he really can't make any money running a business and yet he could make substantially more as somebody else's employee . . . .
> Granted it's possible he would have to move to the west side to do that; but I don't know that when the Legislature made all of the rules about how do you calculate child support, I don't know that they really factored in the fact that somebody could stay near his children and make next to nothing, or move further away from his children and—and make a substantial income. . . . I think he's got an obligation to make a reasonable amount of income when he's capable and has the qualifications to do that.
> So, I think even—even accounting for the fact that—he would have higher living expenses and there'd be traveling expenses and so on, I'm—I'm factoring that in; but I still think that he would—that—that a reasonable imputed amount of income for him would be $60,000.00 a year or $5,000.00 a month.

RP at 362-63 (second alteration in original).

We defer to the trial court's discretion in child support decisions. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990); *In re Marriage of Pollard*, 99 Wn. App. 48, 52, 991 P.2d 1201 (2000). "A trial court abuses its discretion only when its

25

decision is manifestly unreasonable or based on untenable grounds." *In re Marriage of Fiorito*, 112 Wn. App. 657, 663-64, 50 P.3d 298 (2002).

Addressing the net monthly income figure for Ms. Collins first, we find no abuse of discretion. It is the trial court's role to assess credibility and weigh evidence, not ours. *Dalton v. State*, 130 Wn. App. 653, 656, 124 P.3d 305 (2005). The trial court found Ms. Collins's estimate to be a reliable one.

As for Mr. Wallace, before imputing income to determine child support, the trial court must make two inquiries. *In re Marriage of Peterson*, 80 Wn. App. 148, 153, 906 P.2d 1009 (1995); RCW 26.19.071(6). By statute, it must first determine whether the parent is voluntarily unemployed or voluntarily underemployed. RCW 29.19.071(6). In making this determination the trial court looks to the "parent's work history, education, health, and age, or any other relevant factors." *Id.*

It is also statutorily required that "[i]f a parent is underemployed but also 'gainfully employed on a full-time basis,' the court must make a further determination as to whether the parent is 'purposely underemployed to reduce the parent's child support obligation.'" *Peterson*, 80 Wn. App. at 153 (quoting RCW 29.19.071(6)). If the parent is not underemployed for that reason, income may not be imputed. *Id.* The trial court made no findings, oral or otherwise, on whether Mr. Wallace was gainfully employed on a full-time basis and—if he was—whether the reason he was underemployed was to reduce his child support obligation. Findings are required.

If the trial court finds that a parent is voluntarily underemployed and if gainfully employed full-time, is purposely underemployed to reduce the parent's child support obligation, then it must determine the amount of income to be imputed. *See* RCW 26.19.071(6). The statute dictates the basis on which the court should impute income:

> In the absence of records of a parent's actual earnings, the court shall impute a parent's income in the following order of priority:
>     (a) Full-time earnings at the current rate of pay;
>     (b) Full-time earnings at the historical rate of pay based on reliable information, such as employment security department data;
>     (c) Full-time earnings at a past rate of pay where information is incomplete or sporadic;
>     (d) Full-time earnings at minimum wage in the jurisdiction where the parent resides if the parent has a recent history of minimum wage earnings, is recently coming off public assistance, aged, blind, or disabled assistance benefits, pregnant women assistance benefits, essential needs and housing support, supplemental security income, or disability, has recently been released from incarceration, or is a high school student;
>     (e) Median net monthly income of year-round full-time workers as derived from the United States bureau of census, current population reports, or such replacement report as published by the bureau of census.

*Id*.

The parties cite no Washington decision, nor have we identified one, that addresses the question faced by the trial court: whether a noncustodial parent who lives near the children of the marriage must relocate if employment elsewhere will materially

27

increase the parent's earning capacity.[5]  When minimum wage is the basis for imputing income, the statute directs the court to use the minimum wage "in the jurisdiction where the parent resides," but the statute does not otherwise address the geographic area to be considered.  RCW 26.19.071(6)(d).

According to a treatise collecting cases from other jurisdictions, the majority rule is that a support obligor is not required to relocate in order to find a better paying job. LAURA MORGAN, CHILD SUPPORT GUIDELINES INTERPRETATION & APPLICATION § 5.04 & n.26 (2d ed. 2019-1 Supp.) (collecting cases).  Our own review reveals that courts from other jurisdictions have avoided creating bright line rules, however.  *E.g.*, *Reece v. Reece*, 22 Va. App. 368, 376, 470 S.E.2d 148 (1996) (in determining whether parent's failure to relocate amounts to voluntary underemployment, court should consider a number of factors); *Stebbins v. Stebbins*, 754 So. 2d 903, 909 (Fla. Dist. Ct. App. 2000) (declining to adopt bright line rule); *Wrenn v. Lewis*, 818 A.2d 1005, 1011 (Me. 2003) (requiring consideration of nonfinancial hardships associated with "distant" employment

---

[5] We cast the issue in terms of relocating, not commuting, taking judicial notice that for Mr. Wallace to commute from Cle Elum to the jobs identified by Ms. Collins would require daily round trips of approximately 180 miles to a heavily-trafficked job location.  The trial court's oral ruling assumed that relocation might be required.

At the same time, we note testimony that from January 2014, when the parties moved to the Cle Elum home, until April 1, 2015, Mr. Wallace commuted to work in SeaTac.  According to Ms. Collins, he commuted for about an hour and 10 minutes each way.  As earlier recounted, the move to Cle Elum on a full-time basis was not planned, but happened after the parties were unable to close a planned purchase of a home in Gig Harbor.

opportunities); *Chen v. Warner*, 2005 WI 55, 280 Wis. 2d 344, 379, 695 N.W.2d 758 (in

applying "reasonable under the circumstances" standard to mother's employment choice,

her inability to find employment within commuting distance was a factor).

The relatively early decision in *Reece* identified "a number of factors" the court

should consider in deciding whether a failure to relocate constitutes voluntary

unemployment or underemployment, including but not limited to

> (1) the supporting spouse's business ties to the community; (2) the
> supporting spouse's familial ties to the community; (3) whether the
> supporting spouse's relocation would have an undue deleterious effect upon
> his or her relationship with his or her children or other family members;
> (4) the length of time in which the supporting spouse has resided in the
> community; (5) monetary considerations which would impose an undue
> hardship upon the supporting spouse if he or she were forced to relocate;
> (6) the "quality of life" in the respective communities; (7) the geographic
> distance between the respective communities; and (8) the severity of the
> burden which a failure to relocate would have on the obligee spouse.

22 Va. App. at 376.

We construe RCW 26.19.071(6) as requiring similar considerations in determining

whether a parent is underemployed and, if he or she is, in determining the amount of

income to impute. In making employment decisions, married parents regularly weigh

maximizing income against fostering a positive environment and relationship with their

children. The fact that a divorced parent has been designated the noncustodial parent should not deprive him or her of all right to a work/life balance.

We reverse the order of child support and remand for reconsideration of the award of child support and for the entry of findings, following reconsideration, as to (1) whether Mr. Wallace is voluntarily underemployed, (2) whether, despite being underemployed, he is gainfully employed on a full-time basis, (3) if he is, whether he is purposely underemployed to reduce his child support obligation, and finally, if income is to be imputed, (4) the amount of income to be imputed consistent with our construction of RCW 26.19.071(6). It is for the trial court to determine whether to entertain additional evidence and argument, and in what form.

V.      ATTORNEY FEES

Ms. Collins's brief includes a passing request for an award of attorney fees. RAP 18.1(b) provides that a party requesting attorney fees on appeal "must devote a section of its opening brief to the request"; additionally, "[a]rgument[s] and citation to authority are required under [RAP 18.1] to advise [the court] of the appropriate grounds for an award of attorney fees and costs." *Wilson Ct. Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998). Ms. Collins's passing request is insufficient and her request for fees is denied.

We reverse the order of child support, otherwise affirm, and remand for reconsideration of the award of child support and the entry of findings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

31